UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| WAYNE A. BROWN ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 8-308-DBH |
| ) | |
| ) | |
| TOWN OF SOUTH THOMASTON, et al. ) | |
| ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFF'S OBJECTION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### CASE SUMMARY

After a long and excellent work record of 42 years for the Town of South Thomaston, including 16 years as Fire Chief, Wayne Brown brought this action for unlawful whistleblower retaliation. [1] Chief Brown made good-faith, reasonable whistleblower reports to the Selectmen about the serious threat to public safety created by the severe physical restrictions of firefighter

. He also refused to carry out directives from the Selectmen to employ this firefighter as a fire police officer because he had reasonable cause to believe such employment would expose

, other firefighters and the public to serious injury.

The Town, through its Selectmen, retaliated against Chief Brown for his whistleblowing activity with threats, harassment, and other actions that would deter a reasonable employee from making future whistleblower reports, removed key powers of his position, and forced him to resign. For example, at the December 2005 Selectmen's meeting, Selectman Northgraves

---

[1] In accord with Local Rule 56(c), Plaintiff is also filing an Opposing Statement of Material Facts with record

verbally and physically threatened Chief Brown over the dispute about whether to allow          to become a fire police officer. On January 19, 2006, all three Selectmen sent Chief Brown a threatening letter stating that his failure to follow its advice (and that of its lawyers) to employ           as a fire police officer–despite his severe medical restrictions–"was inexcusable" and that "you should not assume that you will be reappointed when your current term expires" in two months.  In about February 2006, the Selectmen placed on the agenda for the annual March town meeting changes in the town Ordinance that took away the key power of the Chief to hire and fire employees of the Fire Department, and those changes were adopted by the Town in late March. In April 2006, the Board threatened Chief Brown that it would take legal action against him if he attempted to resign at any time after taking the oath of office for his new, one-year term.  The Assistant Fire Chief at the time felt that the conditions had become impossible for Chief Brown to continue serving as Chief.

From June 2003 until Chief Brown's resignation in April 2006,           written medical restrictions included          . As the Maine Human Rights Commission Investigator expressly found, another top-ranking member of the Fire Department "could not conceive of any position that       could have performed within the restrictions on him."  Numerous firefighters told Chief Brown that they did not want to work with          because he could not provide proper backup or support in potentially life-threatening situations.

Chief Brown reasonably and in good faith relied upon these written medical restrictions and the Town's own written job descriptions in concluding that          could not safely perform the duties of either a firefighter or a fire police officer. According to the Town's own written job description, the essential duties of the position of a fire police officer required

---

citations to support all the facts relied upon in this objection.

standing continuously for extended periods of time directing traffic and performing crowd control functions at the scene of a fire, and cleaning up fire scenes, including moving debris and fire hoses weighing up to 40 pounds. The firefighter in question could not perform these essential job duties safely given his medical restrictions. In an emergency situation, if a fire police officer could not perform a duty such as directing traffic, a firefighter would have to be called away from the fire to perform that duty for him or the traffic control or other safety function would go undone. In either case, both the public and other fire department employees would be placed at risk of serious injury.

Thus, Chief Brown's actions reporting his opposition to, and refusing directives to make, such a placement, on the grounds that it was a serious safety hazard, were protected activities under the Maine Whistleblowers' Protection Act ("MWPA").

Chief Brown exercised his First Amendment free speech right to criticize the Town and its Selectmen over this fire safety issue by filing this lawsuit on January 22, 2008. In direct response to his court complaint, the Defendants maliciously and gratuitously committed two further acts of retaliation against Mr. Brown, in violation of both the MWPA and the First Amendment. They made unnecessary statement to the press to falsely imply that Chief Brown had acted improperly in ways that intentionally endangered the citizens of South Thomaston.

On January 23, 2008, a local newspaper published an article about the court complaint. The article included a quote from selectman Jeffery Northgraves alleging that former Chief Brown "left the town in a precarious situation with no fire chief." In truth, Chief Brown's two-week notice of resignation fully complied with the Town's Personnel Policy, and the Town appointed a new Chief (who remains in the position today) before the resignation took effect.

On February 15, 2008, the same newspaper published a letter signed by the "South Thomaston selectmen" under the title "South Thomaston selectmen respond to lawsuit." The letter included the allegations that "[Mr. Brown's] abrupt resignation placed the Town in a potentially dangerous and precarious position" and "Although his resignation was not effective until May 1, then-Chief Brown did not respond to two fire calls on April 30." These statements were extremely defamatory and false. They misrepresented to the public that he had intentionally endangered his Town's safety by resigning without giving proper notice and falsely implied that he deliberately refused to respond to two fire calls before his resignation took effect. In fact, Chief Brown was not aware of the April 30 fire until the next day, and it is common for members of the Town's fire department to be unaware of fire calls.

## SUMMARY OF KEY LEGAL POINTS

The Defendants' challenges to plaintiff's retaliation claims under the MWPA and First Amendment are without merit. [2] First, and foremost, Defendants improperly rely on disputed facts and construe the record in the light most favorable to them. For example, they falsely claim as "uncontroverted" that "the written job description for the fire police position does not reflect the job duties actually performed by South Thomaston fire police members," that "       could have performed the fire police duties to the same extent as other fire police members of the South Thomaston Fire Department," that "Plaintiff didn't object to [     ] being a … fire[fighter]" and that plaintiff made "statements to Selectmen that he wanted to keep         in the firefighter position because it would be easier to remove him from the department in that position." Defendants' Motion for Summary Judgment ("Motion") 4-5.

---

[2] Plaintiff's MWPA claims in the First Count are brought against only the Town itself. Plaintiff's free speech and related federal constitutional claims in the Second Count are brought against both the Town and the individual Defendants.

4

Second, Defendants incorrectly state the law concerning what is an adverse action in a statutory employment retaliation case. They rely on obsolete precedents, such as the 1996 decision in *Nelson v. Univ. of Maine System*, and ignore the controlling 2006 decision of the United States Supreme Court ruling that the plaintiff need only show that the employer's actions were "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Sante Fe Railway Co. v. White,* 548 U.S. 53, 57 (2006). Under *Burlington Northern*, Chief Brown does not need to prove either a hostile work environment or a constructive discharge to succeed on his statutory retaliation claim.

Moreover, the MWPA has an unusually broad definition of prohibited adverse employment actions, including even the mere act of "threaten[ing]" an employee. 26 M.R.S.A. § 833 (1). As the Law Court has explained, "threats by an employer against the employee's status of employment may constitute discriminatory acts under the MWPA, without regard to whether or not the threats were actually acted upon." *LePage v. BIW*, 2006 ME 130, ¶21, 909 A.2d 629, 636.

Third, the Town disregards the direct and circumstantial evidence that the threats and other adverse actions they took against Chief Brown were related to his MWPA-protected reports about           and his refusal to comply with their directive to employ           as a fire police officer. For example, both the oral and physical threats made by Selectmen Northgraves against Chief Brown at the December 2005 Selectmen's meeting and the threats in the January 2006 letter from all three selectmen were admittedly about           . In combination with this direct evidence of retaliation, a jury could reasonably infer a causal connection from the close timing of the February action by the Selectmen to propose removal of key powers of the Fire Chief and the

April action by the Selectmen to threaten the Chief with legal action. *See generally Gorman-Bakos v. Cornell Coop.,* 252 F.3d 545, 554 (2d Cir. 2001) (ruling that First Amendment retaliation can be established by close temporal relationship between adverse action and protected activity and that five months is not too long to support allegation of retaliatory motive) (citing *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) for ruling that "eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship").

A jury may also rely on the evidence of false statements by the Defendants to infer unlawful retaliation. For example, the Defendants currently claim that the "2006 amendment to the Fire Department ordinance *clarified* that, for members of South Thomaston Fire Department, the Board of Selectmen had ultimate responsibility to hire and fire all employees." Defendants' Statement of Material Facts ¶95 (emphasis added). Yet, in January 2006, they represented to the Maine Human Rights Commission that under the Town's Fire Department Ordinance, "the Selectmen appoint the Fire Chief; the Fire Chief has authority to hire, appoint and remove for cause members of the Department." Northgraves Dep. Ex. 6 at 1 n. 1. Similarly, the Defendants have made completely inconsistent statements about whether Chief Brown raised safety concerns about         serving as a firefighter. *Compare* Defs. Motion at 5 (arguing that Plaintiff "didn't object to [      ] being a . . . fire[fighter].") *with* Northgraves Dep. Ex. 6 at 2 (Town's representations in January 2006 to Maine Human Rights Commission that Chief Brown had "concerns that           could either injure himself by undertaking tasks [as a firefighter] exceeding his physical limitations, or could endanger another firefighter who mistakenly assumes           is able perform the essential functions of a firefighter").

As the Supreme Court has explained, evidence of a false explanation by an employer for a termination is usually enough by itself to prove intentional employment discrimination: "Such an

6

inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000) (citations omitted); *see also Dykstra v. First Student, Inc.*, 324 F. Supp. 2d 54 (D. Me. 2004) (interpreting *Reeves* to mean that "[i]n most cases" a finding of pretext "when coupled with the plaintiff's *prima facie* case, could reasonably support an inference on the part of jury that the employer 'is dissembling to cover up a discriminatory purpose.'").

      <u>Fourth</u>, the Defendants incorrectly state the law concerning their completely unfounded claim of absolute legislative immunity: "Amendment of the ordinance cannot support liability of any kind." Defs. Motion at 11. The law is clear, however, that the Town cannot invoke legislative immunity or any type of immunity, because "unlike various government officials, municipalities do not enjoy immunity from suit -- either absolute or qualified -- under § 1983." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993); *see also Board of County Commissioners v. Umbehr*, 518 U.S. 668, 677 n. (1996); *Langford v. Atlantic City*, 235 F.3d 845 (3d Cir. 2000). The Selectmen were sued individually only for the statements they made to the press after this lawsuit was filed, and those non-legislative acts do not qualify for absolute legislative immunity. *See, e.g., Cole v. Gray*, 638 F.2d 804, 811 (5th Cir. 1981) (no legislative immunity for making statements to media); *Hutchinson v. Proxmire*, 443 U.S. 111 (1979) (federal legislators are not immune under speech and debate clause for issuing press releases).

      <u>Fifth</u>, Defendants misstate the legal standard for showing unlawful retaliation for First Amendment free speech activity. Consistent with the Supreme Court's ruling in *Burlington Northern*, federal courts of appeal have ruled that any retaliatory conduct sufficient to "deter a

7

similarly situated individual of ordinary firmness from exercising his or her constitutional rights" is actionable in a § 1983 case. *Zelnik v. Fashion Institute of Technology*, 464 F.3d 217, 225 (2d Cir. 2006) (citation omitted), *cert. denied*, 549 U.S. 1342 (2007).  A jury could reasonably find that an ordinary citizen would be deterred from criticizing local government officials if they can respond with impunity by publicly smearing your good reputation in your local newspaper with false allegations of dereliction of duty.  Chief Brown is alleging in his Second Count that the Selectmen's February 2008 press release was in retaliation for his exercise of his federal constitutional rights to free speech and of access to the court by filing his court complaint. Defendants, however, miss the point that this is a retaliation claim and instead devote most of their discussion to non-retaliation cases.

     Sixth, the three individual Defendants' claim to qualified immunity is contrary to clearly established law that that "a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983." *Barrett v. Harrington,* 130 F.3d 246, 264 (6th Cir. 1997); *see also Fraternal Order of Police Hobart Lodge No. 121, Inc. v. City of Hobart,* 864 F.2d 551, 553 (7th Cir. 1988) (stating that "retaliation by public officials against the exercise of First Amendment rights is itself a violation of the First Amendment"). This Court has recently rejected the qualified immunity defense in a similar case when the plaintiff was defamed by a public official for criticizing the government. *Hickson v. Bowler*, 2009 U.S. Dist. LEXIS 22046 (D. Me. Mar. 17, 2009) (Recommended Ruling of U.S. Magistrate Judge Kravchuk); s*ee also Denning v. Povich*, 2004 U.S. Dist. LEXIS 7733 *15-19 (May 3, 2004) (Recommended Ruling of U.S. Magistrate Judge Cohen).

## FACTUAL BACKGROUND

Chief Brown had a long and excellent work record in the Town's Fire Department for 42 years. He served as Chief for 16 years and as Deputy Chief for many years before that.  Although the Town's personnel policy required progressive discipline, Chief Brown never received any notice prior to 2006 of any dissatisfaction with his performance or conduct.

Chief Brown joined the Town Fire Department at the age of 16.  He spent many hours raising money for the Department to supplement its budget to help pay for much needed equipment without burdening the taxpayers.  He volunteered at many town fundraisers including dances, food booths at fairs, and rummage sales.  Chief Brown also spent many hours writing grant applications for the Department and obtained in excess of $150,000 for equipment.  He was also successful in obtaining a $100,000 grant from a local company for the purchase of the new $230,000 fire truck in 2003.

Without even consulting with the Fire Chief, in about October 2002 the Selectmen entered into an agreement with firefighter             , who had significant medical restrictions, to allow him to continue serving as a firefighter with the right to self limit his duties.

In June 2003, the healthcare provider selected by the Town, Health Connections, Occupational Health, placed this firefighter under even more restrictive medical limitations. Chief Wayne Brown reasonably relied upon these medical restrictions and the Town's written job descriptions in concluding that the firefighter could not safely perform the duties of a firefighter or a fire police officer.

In late 2005, the Selectmen directed Fire Chief Brown to employ the firefighter with severe medical restrictions as a fire police officer. Fire Chief Brown opposed this directive in writing in November 2005 and explained why it would be unsafe, in an effort to correct this unsafe directive.

**ADDITIONAL LEGAL ARGUMENTS**

**I**

**EMPLOYMENT DISCRIMINATION CASES ARE NOT WELL SUITED TO RESOLUTION ON SUMMARY JUDGMENT**

The First Circuit has very recently reiterated that summary judgment is not well suited for determining issues of motive and intent in employment discrimination cases, which often depend on evaluation of circumstantial evidence by the factfinder.  *See Deslauriers v. Chertoff*, Civil No. 07-184-B-W, Slip Op. at 2-3 (D. Me. April 16, 2009) (Recommended Ruling of U.S. Magistrate Judge Kravchuk) (discussing March 26, 2009, First Circuit ruling reversing grant of summary judgment based on erroneous assumption "that a plaintiff must have explicit evidence of discrimination to survive summary judgment) (citing *Chadwick v. WellPoint, Inc.*, 2009 U.S. App. LEXIS 6426, 2009 WL 782822, 105 Fair Empl. Prac. Cas. (BNA) 1457); *see also McDonough v. City of Quincy,* 452 F.3d 8, 17 (1st Cir. 2006) ("Determinations of motive and intent, particularly in discrimination cases, are questions better suited for the jury.").

During this decade, the Supreme Court has time and again emphasized that in employment discrimination cases it is the proper role of the jury at trial – and not of the court on summary judgment – to evaluate the specific context of ambiguous statements by management officials and other circumstantial evidence that may in their totality indicate that the employer considered unlawful factors when making adverse employment actions.[3]  These unanimous

---

[3] *See Ash v. Tyson Foods*, 546 U.S. 454 (2006) (reversing lower court decision disregarding jury interpretation of ambiguous comment by decisionmaker possibly evincing employment discrimination); *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) (rejecting court-created rule requiring direct evidence of discrimination for employee to pursue more lenient, mixed motive burden in Title VII); *Reeves* 530 U.S. 133 (2000); *see also Burlington Northern and Sante Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (rejecting the position of those circuits that had created artificial requirement, not found in statutory language of Title VII, limiting the scope of actionable retaliatory conduct to "ultimate employment decisions" and resulting in the wrongful dismissal of many retaliation claims at the summary judgment stage).

Supreme Court decisions have all strongly criticized lower courts for creating and applying artificially burdensome legal standards to prevent juries from exercising their proper role to resolve statutory employment discrimination claims.  For example, in *Reeves* the Supreme Court reprimanded the lower court for improperly discounting the employee's evidence of discrimination and for placing too much weight on evidence supporting the employer. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 153 (2000). The Supreme Court further instructed lower courts that they "must disregard all evidence favorable to the moving party that the jury is not required to believe" and that they "should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* at 151 (internal quotations omitted).

## II

### THE DEFENDANTS IMPROPERLY ARGUE
### THE FACTS IN THEIR OWN FAVOR

The Defendants repeatedly violate the cardinal rule of summary judgment by presenting the facts in the light most favorable to them.[4]  *Chadwick,* 2009 U.S. App. LEXIS 6426 *2, 105 Fair Empl. Prac. Cas. (BNA) 1457 (1st Cir. Mar. 26, 2009) ("It is elementary that at summary judgment a court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the same."). In addition to the specific examples noted

---

[4] A court must "draw all reasonable inferences in favor" of the nonmoving party and "may not consider the credibility of witnesses, resolve conflicts in testimony or evaluate the weight of the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 152 (2000); *see also McDonough v. City of Quincy,* 452 F.3d 8, 17 (1st Cir. 2006). When the "undisputed facts require a choice between competing inferences, and . . . both inferences are plausible, the choice cannot be made under the banner of summary judgment." *In re Varrasso*, 37 F.3d 760, 764 (1st Cir. 1994); *see also La Amiga del Pueblo, Inc. v. Robles*, 937 F.2d 689, 691 (1st Cir. 1991) (a fundamental principle of our jurisprudential system is that, "when the evidence as a whole can plausibly support more than one view of a situation, '[j]urors, using common sense and collective experience assess credibility and probability, and proceed to make evaluative judgments'" on a case-by-case basis).

*supra* at pages 4-5, Defendants also improperly argue that "there is no evidence the January 19, 2006 letter was motivated by retaliation for Plaintiff's allege protected report or refusal." Defs. Motion at 13. Yet, on its face this letter provides direct evidence that it was in retaliation for Chief Brown's safety objections and refusal to comply with the Selectmen's request that he employ              as a fire police officer. Defendants may argue to the jury that this letter does not mean what it seems to say, but their preferred, albeit less plausible, interpretation of this documentary evidence is not a proper basis for a motion for summary judgment. Resolving such factual disputes is why we have jury trials. *Toomey v. UNUM Life Ins. Co*., 324 F. Supp. 2d 220, 222 n. 2 (D. Me. 2004) (noting that a party's "mischaracterization of the stated material facts" warrants Court to "summarily" deny a motion "for summary judgment on the basis of genuine issues of material fact").

### III

### AN EMPLOYEE IS PROTECTED UNDER THE MWPA AS LONG AS HIS WHISTLEBLOWING IS IN GOOD FAITH AND BASED ON A REASONABLE BELIEF

Chief Brown is protected under the MWPA because a jury could reasonably conclude that he had a good faith, reasonable belief that he was reporting unsafe conditions and was refusing a directive that would expose Fire Department employees and the public to serious injury. *See Bard v. Bath Iron Works, Corp.*, 590 A.2d 152 (Me. 1991). He does not need to prove that he was right, but rather is protected from retaliation as long as an employee with his training and experience might reasonably believe that the conditions he was reporting or resisting were unsafe. *See Appeal of Osram Sylvania, Inc.,* 706 A.2d 172, 175 (N.H. 1998) (interpreting almost

identical language in the New Hampshire Whistleblowers' Act); *Wichita County, Texas v. Hart*, 917 S.W.2d 779, 784-85 (Tex. 1996).

For example, the First Circuit has ruled that an employee is still protected from retaliation even if the employee was wrong and the opposed activity was not actually a violation of law so long as the "plaintiff has a reasonable belief that there is a [employment discrimination] violation." *Petitti v. New England Tel. & Tel. Co*., 909 F.2d 28, 33 (1st Cir. 1990) (Title VII); *see also Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 174-75, 177 (1st Cir. 2003) (ADA) (ruling that an employee engages in protected activity under the anti-retaliation provisions of the ADA when he opposes what he reasonably believes is a violation of the Act).

### IV

**A REASONABLE JURY COULD FIND THAT THE SELECTMEN'S PUBLIC STATEMENTS THAT CHIEF BROWN SHIRKED HIS DUTIES AS FIRE CHIEF WERE IN RETALIATION FOR THE CHIEF'S LAWSUIT CRITICIZING THE SELECTMEN'S HANDLING OF FIRE SAFETY ISSUES**

As the First Circuit has ruled, "[t]he standard for showing an adverse employment action is lower in the *First Amendment* retaliation context that it is in other contexts (such as Title VII . . . and the Supreme Court has indicated that even relatively minor events might give rise to liability." *Rivera-Jimenez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir. 2004) (citations omitted). Moreover, the First Amendment prohibition on retaliation by the Government affecting citizens' liberty interests in their employment and reputation is not limited to termination of employment but also includes lesser adverse actions that could have the effect of discouraging the exercise of First Amendment rights. For example, as Judge Posner has explained, a free speech retaliation claim can be based on a single defamatory letter "accusing [Plaintiff] of paranoid

13

misrepresentations, [because] defamation inflicts sufficient harm on its victim to count as retaliation . . . that is, to be capable of deterring the exercise of free speech." *Tierney v. Vahle*, 304 F.3d 734, 740 (7th Cir. 2002) (Posner, J.) (citations omitted); *see also Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997) (holding that statements to press by defendant falsely accusing plaintiff of stalking were sufficiently adverse to support First Amendment retaliation claim).

Even a public employee, who has less protected free speech rights than the Plaintiff here because he was not a public employee when the Selectmen made their public statements, is not limited merely to protection from termination, but also to any adverse action intended to punish the employee for exercising his free speech rights, "even an act of retaliation as trivial as failing to hold a birthday party for a public employee." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 72 (1990) (quotation omitted); *see also Suppan v. Dadonna*, 203 F.3d 228, 235 (3rd Cir. 2000) (holding that any retaliatory conduct "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights" is actionable under § 1983); Rakovich v. Wade, 850 F.2d 1180, 1189 (7th Cir. 1988) (en banc) (ruling that "an investigation conducted in retaliation for comments protected by the first amendment could be actionable under section 1983"); *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) (holding that relatively minor adverse action of imposing additional requirement to be considered for promotion constituted an adverse action sufficient to implicate First Amendment protections); *Smith v. Fruin*, 28 F.3d 646, 649 n.3 (7th Cir. 1984) (stating that "even minor forms of retaliation can support a First Amendment claim, for they may have just as much chilling effect on speech as more drastic measures"); *Yoggerst v. Stewart*, 623 F.2d 35, 39 (7th Cir. 1980) (holding that a "verbal reprimand" is sufficient adverse action to constitute violation of public employee's free speech right).

Moreover, courts have repeatedly held that an adverse employment reference by itself is sufficiently adverse to be actionable under employment discrimination laws. *See, e.g., Hashimoto v. Dalton*, 118 F. 3d 67, 674 (9th Cir. 1997) (citation omitted), *cited favorably by, Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73 (1st Cir. 2007); *Shehadeh v. Chesapeake & Potomac Tel. Co.*, 595 F.2d 711 (D.C.Cir.1978).

Because Chief Brown easily satisfies the *Burlington Northern* adverse action test in a Title VII retaliation case, it is even clearer that he satisfies the lower threshold for adverse actions in the First Amendment retaliation context.[5]

## V

### CHIEF BROWN'S FIRST AMENDMENT RIGHT TO SPEAK PUBLICLY AND FILE A LAWSUIT ABOUT FIRE SAFETY ISSUES, WITHOUT GOVERNMENT RETALIATION, WAS CLEARLY ESTABLISHED BEFORE 2008 AND NOT SUBJECT TO QUALIFIED IMMUNITY

The law has long been settled that the Government cannot punish citizens for exercising their First Amendment rights. *See generally Barrett v. Harrington,* 130 F.3d 246, 264 (6th Cir. 1997)(recognizing that "it is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983"); *Fraternal Order of Police Hobart Lodge No. 121, Inc. v. City of Hobart,* 864 F.2d 551, 553 (7th Cir. 1988) (stating that "retaliation by public officials against the exercise of <u>First Amendment</u> rights is itself a violation of the <u>First Amendment</u>"). In a nation that has enshrined freedom of expression "near the top of the hierarchy of constitutional rights," it is obvious that government officials

---

[5]   *See, e.g.,* Power (any deprivation that "is likely to deter the exercise of free speech" is actionable);*DeGuiseppe v. Village of Bellwood,* 68 F.3d 187, 192 (7th Cir. 1995) ("Under the law of this Circuit, retaliation need not be monstrous to be actionable under the First Amendment; it need merely create the potential for chilling employee speech on matters of public concern.").

cannot be allowed to punish a private citizen for criticizing them by falsely smearing their good reputation. *Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 11-12 (1st Cir. 2004) (citation omitted). *See generally Pickering v. Board of Educ.*, 391 U.S. 563, 574 (1968) (noting that retaliatory acts are "a potent means of inhibiting speech").

This Court has recently rejected qualified immunity defense in a similar case when the plaintiff was defamed by a public official for criticizing the government. *Hickson v. Bowler*, 2009 U.S. Dist. LEXIS 22046 (D. Me. Mar. 17, 2009) (Recommended Ruling of U.S. Magistrate Judge Kravchuk). Similarly, this court has also rejected the qualified immunity defense in another First Amendment retaliation case. *See Denning v. Povich*, 2004 U.S. Dist. LEXIS 7733 *15-19 (May 3, 2004) (Recommended Ruling of U.S. Magistrate Judge Cohen). Judge Cohen's reasoning also applies here:

> In *Rivera-Jimenez*, the First Circuit held that the unconstitutionality of retaliation for a public employee's speech on a matter of public concern has been clearly established in this circuit at least since 1993. *362 F.3d at 95*. The defendant contends that this case nonetheless presents a situation in which the constitutional right was not clearly established because a "double" violation is alleged -- that the defendant did not directly cause the constructive discharge but rather caused others to act in a manner that caused the constructive discharge. . . . However, this argument deals with the manner in which the violation of the right occurred, not the question whether the right itself was clearly established. There can be no doubt that the answer to the question when properly posed is that the right itself was clearly established.

*Id*. at 15-16.

Because "it is evident that the *First Amendment* right to criticize public officials is well-established and supported by ample case law [and] it is well-established that a public official's retaliation against an individual exercising his or her *First Amendment* rights is a violation of § 1983," the selectmen are not entitled to qualified immunity for publicly defaming Mr. Brown

because of his lawsuit criticizing their handling of fire safety issues. *Barrett,* 130 F.3d at 264. [6]

Date: April 21, 2009.

                                                    Respectfully submitted,

                                                    /s/ David G. Webbert, Esq.
                                                    David G. Webbert
                                                    JOHNSON & WEBBERT, L.L.P.
                                                    160 Capitol Street, Suite 3, P.O. Box 79
                                                    Augusta, Maine 04332-0079
                                                    Tel: 207-623-5110
                                                    dwebbert@johnsonwebbert.com

                                                    Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2009, I electronically filed **PLAINTIFF'S OBJECTION TO**

---

[6] In addition, qualified immunity would not protect the individual selectmen from the claims against them in their official capacity for declaratory and injunctive relief. *See, e.g*., *Behrens v. Pelletier*, 516 U.S. 299, 312 (1996) (recognizing that when "the complaint seeks injunctive relief . . . no 'clearly established' right need be alleged"); *Wood v. Strickland*, 420 U.S. 308, 314 n.6 (1975) ("immunity from damages does not ordinarily bar equitable relief as well"); *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 705 (1st Cir. 1993) (ruling that "when a plaintiff seeks equitable relief from a defendant in his capacity as an officer of the state, qualified immunity is not a viable defense").

    Mr. Brown has sued the selectmen in their official capacities for prospective relief. Mr. Brown's complaint expressly requests that they be ordered to retract their statements falsely criticizing Plaintiff. First Amended Complaint ¶ 24(b). Such types of relief are well recognized as appropriate in § 1983 actions against government officials in their official capacity. *See, e.g*., *Nix v. Norman*, 879 F.2d 429, 433 (8th Cir. 1989) (injunction ordering defendant to clear plaintiff's employment record of any false allegations of improper behavior).

    An official retraction of the Defendants' written adverse comments questioning Mr. Brown's fitness to serve as a Fire Chief would clear his employment record as Fire Chief of an ongoing stain on his reputation and improve his future employment prospects.

    Even if these permissible forms of equitable relief are ultimately not ordered, the court may exercise its discretion to order declaratory relief, which is inherently less intrusive. *Steffel v. Thompson*, 415 U.S 452, 469 (1974). At the summary judgment stage, it would be premature to rule out the appropriateness of a declaratory judgment, which is "a milder alternative to the injunction remedy." *Perez v. Ledesma*, 401 U.S. 82, 111 (1971). For example, one court of appeals has ruled that a § 1983 plaintiff was entitled to declaratory judgment, even though he was not entitled to injunctive relief, because a showing of irreparable harm is not required for declaratory relief. *Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir. 1992).

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Mark E. Dunlap and Anne M. Carney, NORMAN, HANSON & DETROY, LLC, 415 Congress Street, P.O. Box 4600, Portland, ME  04112-2600, mdunlap@nhdlaw.com and acarney@nhdlaw.com.

/s/ David G. Webbert