## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

WAYNE BROWN,                        )
                                    )
                Plaintiff           )
v.                                  )          Civil No. 08-308-P-H
                                    )
TOWN OF SOUTH THOMASTON, et al.,    )
                                    )
                Defendants          )

### MEMORANDUM DECISION ON MOTION TO STRIKE
### AND RECOMMENDED DECISION ON DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

In this employment action, the Town of South Thomaston ("South Thomaston" or "Town"), John Spear, Jeffrey Northgraves, and Penelope Alley move for summary judgment as to both counts of former South Thomaston Fire Chief Wayne Brown's first amended complaint against them, alleging violations of the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S.A. §§ 831-40, and of Brown's federal constitutional rights to free speech and access to the courts. *See* Defendants' Motion for Summary Judgment ("S/J Motion") (Docket No. 22) at 1; First Amended Complaint ("Amended Complaint") (Docket No. 4) ¶¶ 19-24.[1] The defendants also move to strike a corrected responsive statement of material facts ("SMF") and supporting documents filed by Brown. *See* Defendants' Motion Regarding Late-Filed Pleadings ("Motion To Strike") (Docket No. 38).

For the reasons that follow, I grant in part and deny in part the Motion To Strike and recommend that the court grant the defendants' motion for summary judgment as to Count II but deny it as to Count I.

---

[1] I have cited to sealed versions of the relevant papers. A redacted, public version of the defendants' motion for summary judgment is contained at Docket No. 34.

## I.  Summary Judgment Standards

## A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)).  "A fact is material if it has the potential of determining the outcome of the litigation."  *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Santoni,* 369 F.3d at 598.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id.*  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id.*  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id.*  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id.*

Failure to comply with Local Rule 56 can result in serious consequences.  "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id.*; *see also, e.g., Sánchez-Figueroa v. Banco Popular de P.R.*, 527 F.3d 209,

213-14 (1st Cir. 2008).

## II.  Factual Background

### A.  Motion To Strike

Before setting forth the properly-considered facts relevant to the resolution of the S/J Motion, I turn first to the defendants' Motion To Strike.

Brown's deadline for filing his response to the defendants' motion for summary judgment, following grant of a motion to extend time, was April 21, 2009.  *See* Docket No. 16. On that day he filed both a memorandum of law and a responsive SMF, accompanied by two affidavits.  *See* Docket Nos. 25-27.  The defendants' deadline for filing a reply brief and reply SMF was May 4.  *See* Docket No. 25.  On May 1, without leave of court, Brown filed a "corrected" responsive SMF accompanied by several additional evidentiary documents.  *See* Docket Nos. 30-33.  On May 4, the defendants filed their reply brief and reply SMF.  *See* Docket Nos. 36-37.

The following day, May 5, the defendants filed this Motion To Strike, asking the court to disregard Brown's corrected responsive SMF and all evidentiary documents filed therewith save for redacted versions of the two affidavits timely filed on April 21.  *See* Motion To Strike at 1-2, 4-5.  The defendants sought this relief on grounds that (i) Brown's May 1 filings were untimely, (ii) he failed to file a motion pursuant to Fed. R. Civ. P. 6 to further enlarge his deadline, (iii) he made no showing of excusable neglect, and (iv) the court's consideration of the corrected responsive SMF and newly-filed supporting documents would prejudice the defendants.  *See id.* at 1-5.

In support of the final point, the defendants represented that their counsel did not even become aware of the corrected and new documents until May 3, when she had already

substantially completed the reply brief and reply SMF that were due the following day, and that she therefore was placed in the difficult position of either choosing to file a motion for enlargement of time to file those documents, despite the fact that Brown had neglected to do so himself, or relying on Brown's original, timely filing. *See id*. at 3. She chose to do the latter. *See id*.

Brown opposes the Motion To Strike, stating that (i) the defendants had prior access to all of the evidentiary materials filed on May 1 save for an affidavit of counsel that merely authenticates documents that were exchanged during discovery, (ii) most of the changes to the responsive SMF were stylistic, the only substantive changes being "primarily technical corrections to incorrect or missing cites to evidentiary materials already cited elsewhere[,]" (iii) Brown provided the defendants' counsel a red-lined version of the changes made in the corrected responsive SMF and offered to consent to any extension that the defendants might want, but their counsel refused, (iv) the defendants are not unfairly prejudiced by any changes to Brown's opposing statement of material facts because they have no right under Local Rule 56 to reply to such facts anyway, (v) the defendants are not unfairly prejudiced by any changes to Brown's additional statement of material facts because those changes are "primarily technical corrections" and because the defendants' counsel refused the offer to consent to an extension for the reply materials, and (vi) violations by the defendants of the local rules, including their failure to file short and concise statements of material facts, contributed in the first place to the need to file a corrected responsive SMF. *See* Plaintiff's Objection to Defendants' Motion Concerning May 1, 2009 Filings of Plaintiff (Docket No. 40) at 1-4.

After due consideration of both sides' arguments, I ***GRANT*** the Motion To Strike insofar as it concerns the corrected responsive SMF and ***DENY*** it insofar as it concerns accompanying

evidentiary documents.   "Under the excusable neglect rubric, courts are permitted, when appropriate, to accept late filings caused by inadvertence or mistake."   *Bennett v. City of Holyoke*, 362 F.3d 1, 4 (1st Cir. 2004).   "A trial court's determination as to whether an instance of neglect is (or is not) excusable has a significant equitable component and must give due regard to the totality of the relevant circumstances surrounding the movant's lapse."   *Id*. at 5.

In the circumstances, I decline to take cognizance of the corrected responsive SMF.   As early as March 23, Brown requested that the defendants narrow their SMF.   *See* Docket No. 16. I directed the parties to contact the court before April 3 if that issue and/or a separate dispute regarding document redaction remained unresolved.   *See id*.   In addition, I granted the plaintiff's oral motion for a two-week extension of his deadline to file his opposition to the S/J Motion.   *See id*.   While the parties did contact the court for a further teleconference, they did so in regard to the redaction issue.   *See* Docket No. 19.   No further request was made by the plaintiff either to narrow the defendants' SMF or for additional time to file his opposition.   *See id.*   On May 1, 10 days after timely filing his opposition, and without request for leave of court or the proffer of any excuse, Brown filed his corrected responsive SMF, just three days prior to the defendants' deadline for filing their reply SMF.   While a number of changes were stylistic, others were substantive.   The defendants plausibly complain that they would have had to invest substantial additional time to alter their reply SMF to address the corrected responsive SMF.   The equities in these circumstances tip in favor of the defendants.[2]

I reach the opposite conclusion with respect to the belatedly-tendered evidentiary documents.   Apart from Brown's counsel's affidavit, which merely authenticates previously exchanged documents, none of these materials was new to the defendants.   Taking these

---

[2]   As it happens, my declination to take into consideration the corrected responsive SMF is not outcome-determinative.

6

materials into consideration, to the extent cited in the original, uncorrected SMF, benefits the court and causes no prejudice to the defendants.

## B.  Relevant Facts

The parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, with disputes in cognizable facts resolved in favor of the plaintiff as nonmovant, reveal the following facts relevant to this decision.

## 1.  The Parties

South Thomaston, Maine, is a small coastal municipality in Knox County, Maine. Defendants' Statement of Material Facts ("Defendants' SMF") (Docket No. 24) ¶ 1; Response to Defendant[s'] Alleged Facts ("Plaintiff's Opposing SMF"), commencing on page 1 of Plaintiff's Response to Defendant[s'] Statement of Material Facts ("Plaintiff's SMF Response") (Docket No. 27), ¶ 1.  According to the most recent census, its population in 2000 was 1,416.  *Id.*

South Thomaston has a town meeting/selectmen form of government.  *Id.* ¶ 2.  The town meeting traditionally occurs on the last Tuesday in March.  *Id.*  The selectmen serve as the executive arm of government, administering, enforcing, and carrying out the municipal functions of the town as well as the decisions made at the town meeting.  *Id.*  Selectmen receive a stipend of $1,290 per year for performance of their official duties.  *Id.* ¶ 3.  Each selectman spends approximately 25 hours per month performing those duties.  *Id.*

Alley has been a selectman for the Town since 1999.  *Id.* ¶ 4.  Northgraves was first elected to the position of selectman by the citizens of South Thomaston in midsummer 2004 and has served in that capacity since.  *Id.* ¶ 5.  He also served the Town as a volunteer firefighter in the South Thomaston Fire Department ("Fire Department") from late 2001 until early 2005.  *Id.*

7

He took a leave of absence from the Fire Department because he felt that he would have to recuse himself from any discussions about Fire Department issues if he continued to fill both roles. *Id*. Spear was a selectman for the Town from 2003 until his term expired on March 31, 2009. *Id*. ¶ 6. He also had previously served for a three-year term beginning in the late 1990s. *Id*.

Brown had a long and excellent work record for the Fire Department, for which he worked for 42 years. Plaintiff's Statement of Additional Material Facts ("Plaintiff's Additional SMF"), commencing on page 95 of Plaintiff's SMF Response, ¶ 1; Defendants' Reply Statement of Material Facts ("Defendants' Reply SMF") (Docket No. 37) ¶ 1. Brown's father served as fire chief for many years. Defendants' SMF ¶ 7; Deposition of Wayne A. Brown ("Brown Dep."), attached to Defendants' SMF, at 165. Brown joined the Fire Department at the age of 16. Plaintiff's Additional SMF ¶ 2; Defendants' Reply SMF ¶ 2. He served as its chief for 16 years and as its deputy chief for many years before that. *Id*. ¶ 3.

Brown volunteered at many town fundraisers, including dances, food booths at fairs, and rummage sales. *Id*. ¶ 4. Brown also spent many hours writing grant applications for the Fire Department and obtained in excess of $150,000 for equipment. *Id*. ¶ 5. He also was successful in obtaining a $100,000 grant from a local company toward the purchase of a new $230,000 fire truck in 2003. *Id*. ¶ 6. Brown spent many hours raising money for the Fire Department to supplement its budget to help pay for much needed equipment without burdening the taxpayers. *Id*. ¶ 7.

Although the Town's personnel policy requires progressive discipline, Brown never received any notice prior to 2006 of dissatisfaction with his performance or conduct. Plaintiff's Additional SMF ¶ 8; Declaration of Wayne A. Brown ("Brown Decl."), attached to Plaintiff's

SMF Response, ¶ 9.[3]

## 2. Brown's Denial of 2002 Request To Move to Fire Police Position

In 2002, A.G., a Fire Department member who had sustained a back injury, requested to be moved from a firefighter position to a fire police position. Defendants' SMF ¶ 8; Plaintiff's Opposing SMF ¶ 8. Brown denied that request. *Id*. The June 2002 letter that Brown received from A.G. stated: "I am writing this letter to request to be transferred to Fire Police. I have done a lot for this department and the fire police position like driving and operating the fire apparatus does meet my restrictions." *Id*. ¶ 9. Brown informed A.G. that he would not transfer him to the fire police position because the department did not need additional personnel in that position. *Id*.

In March 2003, A.G. and the Town reached a mediated settlement agreement of a 2002 Maine Human Rights Commission ("MHRC") charge of discrimination that A.G. filed based on Brown's denial of his request to transfer to the fire police position. *Id*. ¶ 10. Without even consulting with the fire chief, in about October 2002, the selectmen entered into an agreement with A.G. to allow him to serve as a firefighter with the right to self-limit his duties. Plaintiff's Additional SMF ¶ 16; Defendants' Reply SMF ¶ 16. It was not appropriate for the selectmen to reach an agreement with a member of the Fire Department about the terms of his or her employment without consulting the fire chief. *Id*. ¶ 17. Brown disagreed with the settlement agreement because he "wasn't involved with the settlement whatsoever." Defendants' SMF ¶ 11; Plaintiff's Opposing SMF ¶ 11.[4]

---

[3] The defendants deny this, *see* Defendants' Reply SMF ¶ 8; however, I view the evidence in the light most favorable to Brown as nonmovant.

[4] Brown qualifies this statement, asserting that he disagreed with his lack of involvement in the settlement and felt that he should have been consulted, in his capacity as fire chief, about the safety issues it raised. *See* Plaintiff's Opposing SMF ¶ 11; Brown Decl. ¶ 47. He adds that the settlement placed an employee with serious medical disabilities in a firefighter position with the right to self-limit his duties without any safeguards to protect the firefighter, other members of the Fire Department, or the public from the potential safety hazards this raised. Plaintiff's Opposing SMF ¶ 11; Brown Decl. ¶ 48.

Brown assumes that, on about March 6, 2003, in accordance with paragraph 3 of the settlement agreement, he received a report from A.G.'s doctor. *Id.* ¶ 12.[5] This document indicated that A.G. had "reached maximum medical improvement" and was restricted from "prolonged standing." Plaintiff's Additional SMF ¶ 9; Defendants' Reply SMF ¶ 9.[6] Neither A.G. nor his physician ever provided Brown with documentation releasing A.G. from this medical restriction or modifying it in any way. *Id.* ¶ 10.[7] Brown believed that A.G. remained restricted from prolonged standing throughout Brown's service as chief of the Fire Department because the documentation did not indicate that this restriction was temporary but instead stated that it was based on A.G.'s reaching maximum medical improvement. Plaintiff's Additional SMF ¶ 11; Brown Decl. ¶ 13. Neither A.G. nor his physician ever indicated to Brown that the restriction on prolonged standing was no longer in effect. Plaintiff's Additional SMF ¶ 12; Brown Decl. ¶ 14.[8]

On June 14, 2003, Brown sent A.G. a letter stating that he had to set up a fitness for duty examination with Health Connections, an organization that evaluates the fitness for duty of public safety personnel. Defendants' SMF ¶ 13; Plaintiff's Opposing SMF ¶ 13. Health Connections completed a fitness for duty evaluation dated June 23, 2003, ("2003 Evaluation") stating that A.G. "may drive fire trucks, operate pumps, [and] assist with air bottle change-out," which were basically the functions that he was performing at that time. Defendants' SMF ¶ 14;

---

[5] My recitation incorporates Brown's qualification to the extent that it is supported by the citations given.

[6] The defendants qualify this statement, *see* Defendants' Reply SMF ¶ 9, asserting, in cognizable part, that three months after A.G.'s doctor made the quoted statements, a health care provider selected by Brown evaluated A.G.'s fitness for duty to work as a firefighter and imposed no standing restrictions, *see* Brown Dep. at 231-32; Exh. 20 to Brown Dep. ("Brown Dep. Exh. 20"), attached to Defendants' SMF.

[7] The defendants purport to qualify this statement, *see* Defendants' Reply SMF ¶ 10, but their qualification is not supported by the citation given and is on that basis disregarded.

[8] The defendants deny paragraphs 11 and 12, *see* Defendants' Reply SMF ¶¶ 11-12; however, I view the evidence in the light most favorable to Brown as nonmovant.

Brown Dep. Exh. 20; Deposition of Jeffrey Northgraves ("Northgraves Dep."), attached to Defendants' SMF, at 149.

The 2003 Evaluation prohibited A.G. from climbing ladders or working with shovels, rakes, or axes, limited him to performing minimally, for no more than nine minutes per hour, the activities of pushing, pulling, twisting, bending, kneeling, crawling, stooping, and climbing on or off the truck, and limited him to lifting or carrying no more than 20 pounds for no more than 21 minutes an hour and working overhead for no more than 21 minutes an hour. Plaintiff's Additional SMF ¶ 13; Defendants' Reply SMF ¶ 13.[9] The list of restrictions contained in the 2003 Evaluation remained the same for the rest of the time that Brown was fire chief. Plaintiff's Additional SMF ¶ 14; Brown Dep. at 238.[10]

On August 6, 2003, Brown informed A.G. that he was not to report to fire calls or drills "until you are cleared for full duty as a firefighter." Defendants' SMF ¶ 15; Plaintiff's Opposing SMF ¶ 15.

### 3. Brown's Denial of 2005 Request To Move to Fire Police Position

As of 2005, Brown and other Fire Department members, including Bryan Calderwood and Colin Grierson, then both Fire Department captains, remained concerned that maintaining A.G. in a firefighter position posed a safety risk. Defendants' SMF ¶¶ 18, 26-30; Plaintiff's Opposing SMF ¶¶ 18, 26-30; Plaintiff's Additional SMF ¶ 29; Declaration of Colin Grierson ("Grierson Decl."), attached to Plaintiff's SMF Response, ¶¶ 2-3.

Relying on the 2003 Evaluation, Brown concluded that it was unsafe for A.G. to perform the firefighter duties in December 2005 because he "couldn't do the duties of a firefighter. He

---

[9] The defendants qualify this statement, *see* Defendants' Reply SMF ¶ 13, asserting that the June 2003 evaluation imposed no restriction at all on standing, *see* Brown Dep. Exh. 20.

[10] The defendants deny this, *see* Defendants' Reply SMF ¶ 14; however, I view the evidence in the light most favorable to Brown as nonmovant.

couldn't climb a ladder, he couldn't wear an air pack.  I believe somewhere[] it says not to use axes and shovels, and those are all equipment and things that's necessary to do the duties of a firefighter."  Defendants' SMF ¶ 18; Plaintiff's Opposing SMF ¶ 18.

Brown felt that it was dangerous for both A.G. and other firefighters to have A.G. in the firefighter position because he could fall off a ladder and because the weight of an air pack exceeded the June 23, 2003, weight restriction.  *Id.* ¶ 19.  He also felt that A.G.'s physical limitations made it difficult for him to "work as a team."  *Id.*  The "worst case scenario" as a result of A.G.'s inability to perform firefighter duties at the scene of a fire was that "somebody is going to get hurt."  *Id.* ¶ 20.

If A.G.'s physical limitations had been removed, Brown would have allowed him to come back to duty as a firefighter notwithstanding the allegations A.G. made against Brown. Plaintiff's Additional SMF ¶ 34; Defendants' Reply SMF ¶ 34.  The Town was aware that, after the March 3, 2003, settlement agreement, Brown was concerned that A.G.'s employment as a firefighter could result in injury to A.G. or another firefighter, given his medical condition.  *Id.* ¶ 35.  Brown reported to the selectmen that it was a safety risk to allow A.G. to remain in the firefighter position and that he did not think A.G. could safely perform the duties of a firefighter without creating a likely risk of serious injury to A.G. or others.  *Id.* ¶ 36.  At times after the March 3, 2003, settlement agreement, Brown directed A.G. not to participate in fire calls or drills because of his concerns about A.G.'s ability to safely perform the duties of a firefighter.  *Id.* ¶ 37.

As of January 20, 2006, the Town considered it to be a legitimate concern that A.G.'s medical restrictions prohibited him from performing the essential functions of a firefighter and conveyed this to the MHRC.  *Id.* ¶ 39.  In a letter to the MHRC dated January 20, 2006, the

Town admitted that it was aware that Brown had indicated that A.G. was a safety concern as a firefighter and that Brown had at times directed him not to participate in fire calls or drills because A.G. was a safety concern as a firefighter. *Id*. ¶ 40.

In 2005, A.G. again requested to be moved from a firefighter position to a fire police position, and Brown again denied the request. Defendants' SMF ¶ 16; Plaintiff's Opposing SMF ¶ 16. Brown reported to the selectmen that it would be a safety risk to allow A.G. to work as a fire police officer and that he did not think A.G. could safely perform the duties of a fire police officer without creating a likely risk of serious injury to A.G. or others. Plaintiff's Additional SMF ¶ 57; Defendants' Reply SMF ¶ 57. Brown agrees that keeping A.G. in a firefighter position did not pose less of a safety risk than moving him to the fire police position. Defendants' SMF ¶ 22; Plaintiff's Opposing SMF ¶ 22. Brown believes that transferring A.G. from the firefighter position to the fire police position presented "the same risk." *Id*. ¶ 23.[11]

A fire police officer directs traffic and performs other critical safety functions at the scene of a fire and takes care of equipment following the fire, including the removal of heavy fire hoses. Plaintiff's Additional SMF ¶ 41; Defendants' Reply SMF ¶ 41. This is an important position that protects the safety of the public and the firefighters alike. *Id*. The position is designed to assist the fire chief in carrying out his duty to suppress disorder and tumult at the scene of a fire and generally to direct all operations to prevent further destruction and damage. *Id*.[12]

In order to meet the requirements of the Town's written job description in effect at the

---

[11] Calderwood's concern in 2005, when he was a Fire Department captain, that A.G. could not safely perform firefighter duties would have been alleviated if A.G. had been transferred from a firefighter position to a fire police position. Defendants' SMF ¶ 30; Plaintiff's Opposing SMF ¶ 30.

[12] The defendants qualify this statement, *see* Defendants' Reply SMF ¶ 41, asserting that Brown's declaration is consistent with the written job description but not with the actual practices of the Fire Department in 2005 and 2006, *see* Deposition of Bryan Calderwood ("Calderwood Dep."), attached to Defendants' SMF, at 39-40, 58-61.

time for the fire police officer position, an employee must at a minimum be able to stand continuously for extended periods of time directing traffic and performing crowd control functions and clean up fire scenes, including moving debris and fire hoses, which weigh 40 pounds or more.  *Id.* ¶ 19.[13]  Both fire police members of the Fire Department were able to perform all of the essential functions of the fire police position described in the written job description.  *Id.* ¶ 20.[14]

Based on his medical restrictions, A.G. could not perform all of the essential functions of the fire police position set forth in the written job description.  *Id.* ¶ 21.  In order to perform the position of fire police officer without endangering other fire department employees or the public, an employee would at a minimum have to be able to move fire hoses, which weigh considerably more than 20 pounds, and stand continuously for extended periods of time directing traffic and performing crowd control functions.  *Id.* ¶ 25.[15]

The Fire Department's fire police officers have to stand for extended periods of time. Plaintiff's Additional SMF ¶ 47; Grierson Decl. ¶ 7.  A fire police officer sometimes had to stand and direct traffic for as many as five consecutive hours.  Plaintiff's Additional SMF ¶ 48; Grierson Decl. ¶ 7.[16]  Both of the Fire Department's longtime fire police officers, Elbert Burton and George Kibitz, stood continuously for an hour or longer in order to perform their duties as

---

[13] The defendants qualify this statement, *see* Defendants' Reply SMF ¶ 19, asserting that Brown's declaration is consistent with the written job description but not with the actual practices of the Fire Department in 2005 and 2006, *see* Calderwood Dep. at 39-40, 58-61.

[14] The defendants qualify this statement, *see* Defendants' Reply SMF ¶ 20, asserting that Brown did not require the existing fire police to undergo a fitness for duty evaluation and concluded that they were able to perform the essential functions of the job because they were doing it, did not have any objections, and did not ask for any accommodations, *see* Brown Dep. at 183, yet Brown did not allow A.G. to try the fire police job and see if he could do it without objections or accommodations, *see id.* at 179.

[15] The defendants qualify this statement, *see* Defendants' Reply SMF ¶ 25, asserting that Brown's declaration is consistent with the written job description but not with the actual practices of the Fire Department in 2005 and 2006, *see* Calderwood Dep. at 39-40, 58-61.

[16] The defendants deny paragraphs 47 and 48, *see* Defendants' Reply SMF ¶¶ 47-48; however, I view the evidence in the light most favorable to Brown as nonmovant.

fire police officers.  Plaintiff's Additional SMF ¶ 49; Defendants' Reply SMF ¶ 49.[17]  Fire hoses

can weigh up to and over 40 pounds.  *Id.* ¶ 50.  A.G. was medically restricted from lifting more

than 20 pounds during the 2005-2006 timeframe.  *Id.*  During Brown's service as fire chief, an

inability to lift fire hoses weighing 40 pounds made it impossible to perform the fire police

officer job.  *Id.*[18]  Spear equated the level of risk involved in putting A.G. in the fire police

position with "being shot in the head with a . . . BB gun."  *Id.* ¶ 52.

A.G.'s medical restrictions as communicated to Brown by medical professionals who

evaluated him prevented A.G. from standing for prolonged periods and lifting more than 20

pounds.  Plaintiff's Additional SMF ¶ 42; Brown Dep. Exh. 20; Exh. 48 to Brown Dep., attached

to Defendants' SMF.[19]  Brown expressed to Grierson at the time that a serious injury would

likely occur if A.G. was placed in the fire police position.  Plaintiff's Additional SMF ¶ 43;

Grierson Decl. ¶ 6.  Brown expressed concern that A.G.'s medical restrictions did not allow him

to stand for hours at a time, something a fire police officer must be able to do in order to perform

the position safely.  Plaintiff's Additional SMF ¶ 44; Grierson Decl. ¶ 6.[20]

A.G.'s inability to stand for prolonged periods exposed A.G., other Fire Department

members, and the public to serious injury if traffic was not controlled at the fire scene, if a

firefighter or firefighters had to be called away from firefighting duties to control traffic, or if

A.G. exceeded his medical limitations and injured himself.  Plaintiff's Additional SMF ¶ 45;

---

[17] I omit the defendants' purported qualification of this statement, *see* Defendants' Reply SMF ¶ 49, which consists of argument rather than fact.

[18] The defendants qualify paragraph 50, *see* Defendants' Reply SMF ¶ 50, asserting that Brown's declaration is consistent with the written job description but not with the actual practices of the Fire Department in 2005 and 2006, *see* Calderwood Dep. at 39-40, 58-61.

[19] The defendants deny this, *see* Defendants' Reply SMF ¶ 42; however, I view the evidence in the light most favorable to Brown as nonmovant.

[20] The defendants' objections to paragraphs 43 and 44 on the ground that they offer inadmissible hearsay, *see* Defendants' Reply SMF ¶¶ 43-44, are overruled.  I construe the statements as being offered not for the truth of the matter asserted by Brown to Grierson, but rather for the fact that Brown expressed certain concerns, however well-founded, at a certain point in time.

Brown Decl. ¶ 25.[21]  Brown was concerned that A.G.'s inability to perform this function of the fire police position would likely lead to a serious injury and that, as fire chief, he could be personally liable for failing to prevent such an injury.  Plaintiff's Additional SMF ¶ 46; Grierson Decl. ¶ 6.[22]

In an emergency situation, if a fire police officer could not perform a duty such as standing to direct traffic, in order to rotate him out either a firefighter would have to be called away from the fire to perform that duty for him or traffic would not be directed.  Plaintiff's Additional SMF ¶ 55; Brown Decl. ¶ 29.  In either case, both the public and other Fire Department employees would be placed at risk of serious injury.  *Id.*  In an emergency situation involving interior firefighting, if a fire police officer could not perform a duty such as standing to direct traffic, multiple firefighters would have to be called out of a burning building or away from firefighting duties so that one of them could relieve the fire police officer.  Plaintiff's Additional SMF ¶ 56; Brown Decl. ¶ 30.[23]

The fire chief in South Thomaston legitimately was concerned about the safety of firefighters.  Plaintiff's Additional SMF ¶ 23; Defendants' Reply SMF ¶ 23.  Ensuring the safety of the Fire Department's operations probably was, and should have been, the fire chief's top

---

[21]  The defendants' objection to this statement on the ground that Brown's declaration contains insufficient detail to permit the court to evaluate whether a genuine issue of fact exists, *see* Defendants' Reply SMF ¶ 45, is overruled.  The statement contains sufficient detail to qualify as a statement of fact rather than a conclusory assertion.  *Compare, e.g., Boyajian v. Starbucks Corp.*, 587 F. Supp.2d 295, 301 (D. Me. 2008) ("Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculations.") (citation and internal quotation marks omitted).

[22]  The defendants' objection to this statement on the ground that it offers inadmissible hearsay, *see* Defendants' Reply SMF ¶ 46, is overruled.  I construe the statement as being offered not for the truth of the matter asserted by Brown to Grierson, but rather for the fact that Brown held certain beliefs, regardless of whether accurate or not, at a certain point in time.

[23]  The defendants' objections to paragraphs 55 and 56 on the ground that Brown's declaration contains insufficient detail to permit the court to evaluate whether a genuine issue of fact exists, *see* Defendants' Reply SMF ¶¶ 55-56, is overruled.  The statements contain sufficient detail to qualify as statements of fact rather than as conclusory assertions.  *Compare, e.g., Boyajian*, 587 F. Supp.2d at 301.

duty.  *Id.*  Brown determined whether A.G. could safely perform the firefighter or fire police positions by comparing A.G.'s physical restrictions, as they were communicated to Brown by medical professionals who had evaluated him, with the essential functions required to safely perform those positions.  Plaintiff's Additional SMF ¶ 24; Brown Decl. ¶ 19.  Brown did not rely on Health Connections' evaluation of whether A.G. was fit for duty as a firefighter in determining whether he was fit for duty as a fire police officer.  Plaintiff's Additional SMF ¶ 26; Brown Decl. ¶ 15.[24]

If a fire chief receives written medical restrictions for a fire police officer from a medical provider, he or she has to go by those.  Plaintiff's Additional SMF ¶ 27; Defendants' Reply SMF ¶ 27.  The fire chief would have to defer to medical expertise on the medical restrictions of an employee.  *Id.* ¶ 28.[25]

Brown offered A.G. another position within the police department that he could safely perform within his medical limitations, the newly-created administrative assistant position, but A.G. refused it.  *Id.* ¶ 32.  A.G. held the secretary-treasurer position and a maintenance position with the Fire Department, but he resigned from those positions.  *Id.* ¶ 33.

The accommodations that Brown offered to A.G. in response to his request for a fire police position were administrative positions and included taking him off active duty.  Defendants' SMF ¶ 40; Plaintiff's Opposing SMF ¶ 40.  Brown felt that:

> In the end it was inevitable, as far as I was concerned, for the betterment of the fire department that [A.G.] should be removed.  But I could not do that during the time of this human rights claim.  It needed to be resolved.  Because if I had fired him during, I felt, during this process, the Maine Human Rights Commission, then I would definitely be retaliating against him, but that is not the case.  I bent over

---

[24] The defendants deny paragraphs 24 and 26, *see* Defendants' Reply SMF ¶¶ 24, 26; however, I view the evidence in the light most favorable to Brown as nonmovant.

[25] The defendants' objections to paragraphs 27 and 28 on the basis that Calderwood's testimony is not relevant in the circumstances presented, *see* Defendants' Reply SMF ¶¶ 27-28, are overruled.

backwards to accommodate [A.G.].

*Id.* ¶ 41.[26]

### 4.  Selectmen's Reaction

Brown believes that he was told he had to put A.G. into a fire police position rather than having him work as a firefighter.  *Id.* ¶ 43.  On November 13, 2005, attorney Linda McGill, retained by the Town to advise it with regard to A.G.'s request for a transfer to the fire police position, advised Brown and the Town to transfer A.G. to that position.  *Id.* ¶ 44.  On November 27, 2005, Brown responded to McGill's legal advice by stating that he disagreed with her interpretation and application of the law:

> [I]t would appear to me the issue is that I refused [A.G.'s] request to put him into a position of fire police and the main topic of the meetings we have had is exactly that.  So, why is the Town spending all of this money and time if there is no complaint or no complaint against me?
>
> ***
>
> If a claim were filed with the Human Rights Commission I feel I would be standing on solid ground.  I feel that I have good standing with the Maine Human Rights Law and have followed the advice and referenced pertinent laws that are in the Maine Municipal Officer's Manual.  Again, some of the information in the manual is from your law firm.  Keeping in mind, as I am sure you are aware, if you go to court in any matter, a positive outcome is not always assured.  This is where people with your expertise come into play, hopefully, to have the outcome be in our favor.  I feel that I have done the best that I can handle in this issue in a professional manner and at times with not much if any support from the municipal officers.  I feel the South Thomaston fire department members and myself deserve to have this issue settled once and for all.  If it ends up in a lawsuit, so be it.  Let['s] base this thing on doing the right thing, not on fear and money.

---

[26] Brown qualifies this statement, *see* Plaintiff's Opposing SMF ¶ 41, stating, *inter alia*, that the reason he thought it was inevitable that A.G. would be removed from the Fire Department was that he could not perform the duties of the firefighter or fire police positions safely but had declined the administrative assistant position and had resigned from secretary-treasurer and maintenance positions with the Fire Department, *see* Brown Decl. ¶ 45.  Brown states that if A.G.'s physical restrictions had been removed, his position would have been that A.G. should be allowed to come back to duty as a firefighter.  *See* Plaintiff's Opposing SMF ¶ 41; Brown Dep. at 238.

*Id.* ¶ 45.[27]  McGill responded to Brown's letter, informing him that she continued to recommend

that he transfer A.G. to the fire police position.  Defendants' SMF ¶ 46; Exh. 58 to Brown Dep.,

attached to Defendants' SMF.[28]  Brown has no legal education or training.  Defendants' SMF

¶ 47; Plaintiff's Opposing SMF ¶ 47.[29]

      In late 2005, after Brown had received A.G.'s letter requesting to be transferred to the fire

police position, as well as the correspondence from McGill and a memorandum from a Town

employee describing statements attributed to A.G., Brown believed "it got to the point where he

needed to be probably removed from the department."  *Id.* ¶ 48.[30]  The memorandum from the

Town employee stated:

> [A.G.] stated this [a suggestion by Alley that he leave the Fire Department] was
> also a violation of his Human Rights.  [A.G.] further stated he held Selectmen
> John Spear & Penelope Alley personally responsible for not taking any action.
>
> [A.G.] said he feels the Fire Chief was harassing him at drills, specifically he
> opened a pump deliberately during drill, in a mean & hurtful manner.  [A.G.]
> stated he had requested the Chief place him in the position of Fire Police in the
> department.  [A.G.] stated he was informed 2 ½ weeks after the request by Deputy
> Chief Paul Rackliff that there were no openings for Fire Police within the
> Department.
>
> [A.G.] said he may have to take action that he really did not want to do.  He stated
> it would "cost the Town a lot of money and put the Town in a very bad position."

Defendants' SMF ¶ 49; Exh. 54 to Brown Dep., attached to Defendants' SMF.[31]

---

[27]  My recitation incorporates Brown's qualification.  *See* Plaintiff's Opposing SMF ¶ 45.

[28]  I have set forth the portion of paragraph 46 that remains uncontroverted despite Brown's denial.  *See* Plaintiff's Opposing SMF ¶ 46.

[29]  Brown qualifies this statement, *see* Plaintiff's Opposing SMF ¶ 47, asserting, *inter alia*, that his years of experience as a Fire Department employee and extensive training in firefighting safety are relevant to evaluating whether a proposed resolution between a town and a disability discrimination claimant creates a risk of serious injury for members of the Fire Department or public and therefore is not an acceptable alternative to litigation, *see* Brown Decl. ¶ 10.

[30]  I omit portions of paragraph 48 that Brown effectively controverts.  *See* Plaintiff's Opposing SMF ¶ 48.

[31]  I have set forth that portion of paragraph 49 that remains uncontroverted despite Brown's denial.  *See* Plaintiff's Opposing SMF ¶ 49.

The fire chief should have some control over his personnel, but employment decisions that involve risk of liability, going to court, or the Town being sued are the responsibility of the board of selectmen rather than of a department head.  Defendants' SMF ¶ 50; Northgraves Dep. at 42, 44.[32]  Northgraves could see why a fire chief or firefighter would be concerned with safety, if a firefighter had the medical restrictions that A.G. had in June 2003.  Defendants' SMF ¶ 51; Plaintiff's Opposing SMF ¶ 51.

The board of selectmen tried to persuade Brown to create a third fire police position for A.G. in the fall of 2005.  *Id.* ¶ 52.  The board of selectmen felt an obligation to accommodate A.G.'s disabilities based upon the letter and the spirit of the MHRC consent agreement.  *Id.* ¶ 53. The board of selectmen also felt that it was not reasonable to remove A.G. from the Fire Department based upon his limitations when the department had accommodated several other individuals in the same position.  *Id.*[33]

A confrontational meeting occurred on December 15, 2005, when Brown informed the board of selectmen that he had received a second charge of discrimination filed by A.G..  *Id.* ¶ 101.  Brown believes that the "main cause of the concern" was the selectmen's belief that Brown's failure to assign A.G. to the fire police position was what caused A.G. to file the charge of discrimination.  *Id.* ¶ 102.

Neither Spear nor Alley has ever threatened to commit any act of physical violence against Brown.  *Id.* ¶¶ 103-04.   Brown considers conduct by Northgraves to have been

---

[32]  Brown's objection to this statement on the ground that it concerns a legal issue and is beyond Northgraves' expertise, *see* Plaintiff's Opposing SMF ¶ 50, is overruled.  Brown does not explain why the division of power between town heads and selectmen would be beyond the ken of one of those selectmen.

[33]  Brown denies that the Fire Department did in fact accommodate several other individuals in the same position. *See* Plaintiff's Opposing SMF ¶ 53.  He asserts that both of the Fire Department's fire police officers were able to perform all of the essential functions of the fire police position set forth in the written job description.  *See id.*; Brown Decl. ¶ 22.

threatening.  *Id.* ¶ 105.  He felt threatened on December 15, 2005, when Northgraves partially

stood up from his chair and, according to Brown, said: "If you had done what we requested, we

wouldn't be in this situation now."  *Id.*[34]

On about January 19, 2006, the selectmen sent Brown a letter warning him that his

employment was in jeopardy because he did not follow "advice" to place A.G. in the fire police

position.  *Id.* ¶ 62; Plaintiff's Additional SMF ¶¶ 65, 69; Exh. 21 to Brown Dep., attached to

Defendants' SMF.  The letter was a warning that if Brown did not "correct his behavior . . . his

position was in jeopardy."  Plaintiff's Additional SMF ¶ 62; Defendants' Reply SMF ¶ 62.  The

letter stated:

> As you know, your one year appointment as Fire Chief expires in April 2006.
> The purpose of the letter is to notify you, as a matter of fairness and professional
> courtesy, of the current position of the Board of Selectmen regarding your status.
>
> The Board of Selectmen presently does not have confidence in your ability to
> effectively serve as Fire Chief.  Consequently, you should not assume that you
> will be reappointed when your current term expires.
>
> The relationship between a part time Board and a department head, in a small
> town with no full time administrator or manager, inherently must be based on a
> high degree of trust.  It is critical that the Board have full confidence that the
> department head will independently exercise prudent and mature judgment and
> will work cooperatively with, and when appropriate, take reasonable direction
> from the Board.  Many of your actions over the past couple of years have
> degraded the level of trust that we expect and need to have with any department
> head.
>
> ***
>
> Specifically, the Board is extremely concerned that you ignored advice given to
> you by the town attorney Fred Newcomb, employment attorney specialist Linda
> McGill, . . . and the Board itself.  The Board believes your failure to follow this
> highly qualified advice, which was amazingly consistent . . ., was inexcusable and

---

[34] Brown qualifies this statement, *see* Plaintiff's Opposing SMF ¶ 105, asserting that his complete testimony as to what Northgraves said on that occasion was: "He threatened to basically fire me or implied that I would be fired. Like I said, he said if you had done what we requested, we wouldn't be in this situation now.  Stuff like that[,]" Brown Dep. at 139.

> borders on recklessness.  While we do not think the pending charge had legal merit, the time, expense and risk of defending a lawsuit may have been avoided by administrative action and sound judgment on your part.
>
> Unfortunately, your actions in this regard are emblematic of your general attitude. . . .  You seem to forget that the South Thomaston Fire Department is just that, a department of the town.

Defendants' SMF ¶ 76; Plaintiff's Opposing SMF ¶ 76.

The Town admits that this letter "was a warning that [Brown] needed to correct his behavior" with regard to putting A.G. in the fire police position and that, if he did not, his position was in jeopardy.  Plaintiff's Additional SMF ¶ 103; Defendants' Reply SMF ¶ 103. Assessing the legal risk of an employment action and deciding whether or not to enter into a situation that would put the Town at risk for liability is the responsibility of the board of selectmen.  Defendants' SMF ¶ 79; Northgraves Dep. at 60.[35]

In response to the January 19, 2006, letter, the selectmen met with Brown and his attorney.  Defendants' SMF ¶ 80; Plaintiff's Opposing SMF ¶ 80.  They communicated to Brown that the letter was not a termination letter.  *Id*.  Alley does not recall Brown's attorney raising, during that meeting, concerns that the letter violated Brown's rights under the Maine Human Rights Act ("MHRA").  Defendants' SMF ¶ 81; Deposition of Penelope Alley ("Alley Dep."), attached to Defendants' SMF, at 9.  Alley "left that executive session thinking that we had conveyed our concerns and we were working toward a better place, and [she] did not believe [Brown] would resign."  Defendants' SMF ¶ 81; Alley Dep. at 10.

At the conclusion of the meeting, Brown's attorney said "something like I am glad we're all on the same page now and we can work through this and go forward."  Defendants' SMF

---

[35] Brown's objection to this statement on the ground that it is a legal issue that Northgraves had no expertise to opine on, *see* Plaintiff's Opposing SMF ¶ 79, is overruled.  Brown does not explain why the division of power between town heads and selectmen would be beyond the acumen of one of those selectmen.

¶ 82; Alley Dep. at 26.  Brown's lawyer indicated "that he understood that [the January 19, 2006,

letter] wasn't a termination letter and we were looking to move forward and appoint [Brown] in

April."  Defendants' SMF ¶ 82; Alley Dep. at 28.

### 5. Firefighting Ordinance Is Amended

From February 25, 2003, until the Fire Department's municipal ordinance was amended

in March 2006, the fire chief had authority to hire, appoint, and remove members of the Fire

Department.  Plaintiff's Additional SMF ¶ 71; Defendants' Reply SMF ¶ 71.  In a letter dated

January 20, 2006, the Town told the MHRC that "[u]nder the ordinance [adopted effective

February 25, 2003], the Selectmen appoint the Fire Chief; the Fire Chief has authority to hire,

appoint and remove for cause members of the Department."  *Id*. ¶ 72.[36]

In about January 2006, the selectmen sponsored amendments to the Town's Fire

Department ordinance that removed the power of the fire chief to employ and remove all

municipal firefighters, an important power of the position.  Plaintiff's Additional SMF ¶ 73;

Brown Decl. ¶ 37.[37]

In South Thomaston, there were two ways to get an item on the warrant for voting at a

town meeting: a referendum from the public or a vote of the board of selectmen.  Plaintiff's

Additional SMF ¶ 74; Defendants' Reply SMF ¶ 74.  The selectmen chose to put the amendment

to the Fire Department ordinance on the Town meeting warrant in direct response to Brown's

opposition to the directive of the board to place A.G. in a fire police position because the board

felt that Brown "felt like he did not need to answer to the select board . . . in regards to

---

[36] The defendants qualify paragraphs 71 and 72, *see* Defendants' Reply SMF ¶¶ 71-72, asserting that Brown recites *his* position with respect to his authority, and that the selectmen, who understood that the board had ultimate authority to make termination decisions, did not share that view, *see* Alley Dep. at 4; Northgraves Dep. at 6, 8-9.

[37] The defendants deny this, *see* Defendants' Reply SMF ¶ 73; however, I view the evidence in the light most favorable to Brown as nonmovant.

employees of the fire department." *Id*. ¶ 75. Grierson believes that the changes were recommended by the selectmen to make Brown resign from his fire chief position. Plaintiff's Additional SMF ¶ 76; Grierson Decl. ¶ 10.[38]

Brown felt threatened by the warrant article placing amendments to the Fire Department ordinance before the Town's voters at the 2006 town meeting. Defendants' SMF ¶ 83; Plaintiff's Opposing SMF ¶ 83. He made statements to a reporter from the local newspaper, the Courier Gazette, regarding his opposition to the warrant article. Defendants' SMF ¶ 84; Brown Dep. at 175.

With the strong backing of the selectmen, the amendments were adopted on about March 26, 2006. Plaintiff's Additional SMF ¶ 77; Defendants' Reply SMF ¶ 77.[39] Brown spoke in opposition to the proposed amendments at the town meeting. Defendants' SMF ¶ 85; Plaintiff's Opposing SMF ¶ 85. A couple of other individuals within the Fire Department supported the amendment. *Id*. ¶ 86.

In 2002 and 2003, Brown had prepared an ordinance changing the Fire Department from an organization run by a constitution and bylaws to an organization organized pursuant to a municipal ordinance. *Id*. ¶ 88. The Fire Department ordinance was passed by a vote of the Town's citizens at the 2003 town meeting. *Id*. Brown believes that the 2006 amendments to the Fire Department ordinance that took "authority away from the fire chief for running the department and especially the personnel issues" were proposed in order to retaliate against him.

---

[38] The defendants' objection to this statement on the ground that it constitutes an inadmissible lay opinion pursuant to Federal Rule of Evidence 701, *see* Defendants' Reply SMF ¶ 76, is overruled. The defendants do not explain how the cited testimony, which seemingly is based on Grierson's perceptions rather than any specialized knowledge or expertise, fails to pass muster pursuant to Rule 701.

[39] The defendants state, and Brown admits, that the amendments were adopted on a different date, March 28, 2006. *See* Defendants' SMF ¶ 85; Plaintiff's Opposing SMF ¶ 85. I use the date set forth by Brown in his SMF. The precise date is in any event immaterial.

*Id.* ¶ 89.[40]

Grierson, who was employed by the Fire Department for 20 years and was deputy fire chief in 2006, did not think a fire chief could function effectively under the ordinance as revised in March 2006 because it was too restrictive of the powers of the fire chief. Plaintiff's Additional SMF ¶ 80; Grierson Decl. ¶ 11. When Grierson found out that Brown was resigning, he did not seek the position of fire chief in part because he did not feel he could function effectively as a fire chief under the ordinance as revised. *Id.*[41]

Under the amended ordinance, the only options that Brown had to oppose a directive of the selectmen to place A.G. in a position that Brown felt was unsafe were to resign or "take[] it to court." Plaintiff's Additional SMF ¶ 81; Northgraves Dep. at 51-53.[42]

### 6. Brown Resigns

The board of selectmen reappointed Brown in 2006 at the same meeting at which it made its other annual appointments. Defendants' SMF ¶ 110; Plaintiff's Opposing SMF ¶ 110. Brown resigned effective May 1, 2006, shortly after he took his oath of office, "because of the conversation that Barbara Black made to me." Defendants' SMF ¶¶ 7, 111; Brown Dep. at 172; Amended Complaint ¶ 15.

Barbara Black is the administrative assistant to the board of selectmen. Defendants' SMF ¶ 121; Northgraves Dep. at 22. Shortly before administering Brown the oath of office, Black, who is also the town clerk, and Brown had a conversation that Brown describes as follows:

---

[40] My recitation incorporates Brown's qualification.

[41] The defendants' objections to paragraph 80 on the grounds that it constitutes inadmissible lay opinion and that Grierson's reasons for not seeking the fire chief position are irrelevant, *see* Defendants' Reply SMF ¶ 80, are overruled. The defendants do not explain how the cited testimony, which seemingly is based on Grierson's perceptions rather than any specialized knowledge or expertise, fails to pass muster pursuant to Federal Rule of Evidence 701. Grierson's perception of the impact of the amendments is relevant.

[42] The defendants deny this, *see* Defendants' Reply SMF ¶ 81; however, I view the evidence in the light most favorable to Brown as nonmovant.

> Like I said, she said: Would you come into the back room of the Town Office. She said: I want to talk with you first.  I said: Okay.  We went into the back room and she starts to say – I can't remember the exact sequence of events, but she said: I've heard that after you take the appointment that you're going to resign.  I said: Who did you hear that from?  She never said.  So I said: You didn't hear it from me.  So that was part of the conversation.  She said: We've had our issues or we have had problems in the past, she says, but I hope you don't resign.  Then she said that she and the selectmen had contacted Maine Municipal and that if I were to resign that they would or could take legal action against me.

Defendants' SMF ¶ 112; Brown Dep. at 173.

The board had asked the administrative assistant to tell Brown that, if he took the oath of office and then resigned, it could accept or decline to accept his resignation.  Defendants' SMF ¶ 134; Northgraves Dep. at 126.  The board did not authorize her to tell Brown that it would take legal action against him if he tried to resign.  *Id*.  The board was not even considering taking such legal action.  *Id*.

Brown's conversation with Black was a factor, but not the only factor, in Brown's decision to resign.  Defendants' SMF ¶ 112; Brown Dep. at 173-74.  In fact, Brown had discussed resigning with other members of the Fire Department.  Defendants' SMF ¶ 113; Plaintiff's Opposing SMF ¶ 113.  He was not in favor of the amendments approved by the voters at the 2006 town meeting.  *Id*.

### 7. Brown Files MHRC Charge, Then Lawsuit; Selectmen Publicly Respond

On June 28, 2006, Brown filed a charge of Whistleblowers' Protection Act retaliation with the MHRC against the Town.  Plaintiff's Additional SMF ¶ 65; Defendants' Reply SMF ¶ 65.  It would have been a dereliction of duty for Brown to allow A.G. to serve as a firefighter or police officer and to ignore the safety hazard posed by an employee who was medically restricted from performing his duties safely.  *Id*. ¶ 66.[43]

---

[43] The defendants qualify this statement, *see* Defendants' Reply SMF ¶ 66, admitting that it was a dereliction of *(continued on next page)*

Brown's whistleblower claim is based on discussions he had with the Town involving transferring A.G. from a firefighter to a fire police position: "Essentially, they were requiring that I put him into a fire police position.  That his physical limitations were in direct conflict with the job description requirements of that position.  Therefore, it impacted his own personal safety, the safety of other firemen and jeopardized the Town."   Defendants' SMF ¶ 73; Plaintiff's Opposing SMF ¶ 73.  Brown's whistleblower claim is based on alleged "demands" that he "put [A.G.] into a fire police position."  *Id*. ¶ 74.[44]

Brown filed the instant complaint, dated January 21, 2008, in Knox County Superior Court, asserting that the Town retaliated against him in violation of the MWPA.  Defendants' SMF ¶ 167; Complaint, attached to Notice of Removal (Docket No. 1).  He later amended his complaint to add First Amendment claims.  *See* Amended Complaint.[45]  The First Amendment claims, asserted against the Town and the selectmen as individuals, are based on two specific newspaper articles published on January 23, 2008, and February 15, 2008.  Defendants' SMF ¶ 178; Brown Dep. at 48-50.

On January 23, 2008, a local newspaper published an article about Brown's court complaint.  Plaintiff's Additional SMF ¶ 83; Brown Dep. at 144.  The article included a quote from Northgraves alleging that Brown "left the town in a precarious situation with no fire chief." Plaintiff's Additional SMF ¶ 84; Brown Dep. at 144.

On February 15, 2008, the same newspaper published a letter signed by "South Thomaston selectmen" under the title, "South Thomaston selectmen respond to lawsuit."

---

duty to keep A.G. in the firefighter position but asserting that the safety hazard that Brown identified would have been eliminated by placing A.G. in a fire police position, *see* Calderwood Dep. at 67.  Brown elsewhere contests the latter proposition.

[44] Brown purports to qualify paragraphs 73 and 74, *see* Plaintiff's Opposing SMF ¶¶ 73-74, but his assertions are not supported by the citations given and are on that basis disregarded.

[45] On September 16, 2008, the defendants removed the matter to this court.  *See* Notice of Removal.

Plaintiff's Additional SMF ¶ 86; Defendants' Reply SMF ¶ 86.  The letter included allegations that Brown's "abrupt resignation placed the Town in a potentially dangerous and precarious position" and "[a]lthough his resignation was not effective until May 1, then-Chief Brown did not respond to two fire calls on April 30."  *Id*. ¶ 87.

The public statements that Brown resigned abruptly and put the Town in a potentially dangerous and precarious position were "a direct response to . . . the filing of [this] lawsuit[.]" Plaintiff's Additional SMF ¶ 88; Northgraves Dep. at 91.

Brown thinks that the newspaper articles retaliated against his exercise of his First Amendment right of free speech "[b]ecause they were deliberately done and it was in a hurtful manner that it was done and violated my constitutional rights."  Defendants' SMF ¶ 179; Brown Dep. at 50.  His right to free speech was harmed "[b]ecause that's part of the constitution.  It says that you shall not do that."  *Id*.

Brown believes that his right to access the court was affected by the two newspaper articles "[b]ecause I believe they were trying to imply that I should not be going to court." Defendants' SMF ¶ 180; Brown Dep. at 50.  Within seven months of the statements, Brown brought a claim in court based upon those statements.  Defendants' SMF ¶ 182; Brown Dep. at 50-51.  There is no claim that Brown has been unable to bring because of the two statements on which his constitutional claim is based.  Defendants' SMF ¶ 183; Brown Dep. at 159.  Brown cannot think of anything that he would have expressed, any speech that he would have made, or any statement that he would have made, that he did not make because of the conduct of the Town or the individual defendants.  Defendants' SMF ¶ 184; Brown Dep. at 159-60.  Brown has lost no employment position, employment opportunity, promotion, or other opportunity for advancement because of the statements.  Defendants' SMF ¶ 185; Brown Dep. at 52.

Brown believes that the statements made in the letter to the editor affected his reputation because of "the fact that they stated I did not respond to fire calls, which was kind of an intentional slam at me, . . . [and] the other comment that I left the Town abruptly."  Defendants' SMF ¶ 190; Brown Dep. at 84.   Brown can identify two people who made comments to him about leaving the Town "in a lurch," Ruth and Rich Liska.  Defendants' SMF ¶ 190; Brown Dep. at 85-87.  Although Brown alleges that the statements violated his First Amendment rights and caused injury to his fire service career, he has not applied for any fire service related job since January 1, 2005.  Defendants' SMF ¶ 191; Brown Dep. at 88.  Brown's pay from the Maine Department of Corrections has not been reduced due to conduct on the part of the Town or the individual defendants.  Defendants' SMF ¶ 192; Brown Dep. at 118.

Brown feels that a quote attributed to Northgraves stating that Brown "left the Town in a precarious situation with no fire chief" violated his constitutional rights because it was untrue and affected his reputation.  Defendants' SMF ¶ 193; Brown Dep. at 144-45.  Brown believes the statement was untrue because he gave the Town two weeks' notice of his resignation.  Defendants' SMF ¶ 193; Brown Dep. at 145.

Brown believes the statement, "Mr. Brown's abrupt resignation placed the Town in a potentially dangerous and precarious position[,]" violated his constitutional rights because it "reflects upon my reputation and causes me harm."  Defendants' SMF ¶ 194; Brown Dep. at 147.  The harm is that people made statements about it.  Defendants' SMF ¶ 194; Brown Dep. at 147-48.  Brown does not think that his resignation put the Town in a potentially precarious position because "there were people in the department that could take over and we have an exceptionally good mutual aid system in this county."  Defendants' SMF ¶ 194; Brown Dep. at 149.[46]

---

[46] Brown purports to qualify paragraph 194, *see* Plaintiff's Opposing SMF ¶ 194, but his qualification is
*(continued on next page)*

### III.  Discussion

### A.  Whistleblowers' Protection Act Claim (Count I)

Brown alleges in Count I of his amended complaint that the Town reassigned, harassed, constructively discharged, and otherwise discriminated and retaliated against him in violation of the MWPA and the MHRA.  *See* Amended Complaint ¶ 20.

"The MHRA provides a right of action to persons who have been subject to unlawful discrimination, including whistleblowers who have suffered retaliatory discharge or other adverse employment actions."  *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 6, 954 A.2d 1051, 1053 (citations and footnote omitted).  "There are three elements to a claim of unlawful retaliation: (1) the employee engaged in activity protected by the statute; (2) the employee was the subject of an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action."  *Id.*[47]

The MWPA protects an employee from adverse employment action taken in retaliation for engaging in conduct that fits within one of five classes of protected activity defined by the statute.  *See* 26 M.R.S.A. § 833(1).  Two classes are relevant here:

> **B.**  The employee, acting in good faith, . . . reports to the employer . . ., orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual. . . .

---

unsupported by the citation given and is on that basis disregarded.

[47] The Law Court has explained the interplay between the MHRA and the MWPA as follows: "The MHRA refers to the [MWPA], providing that it is unlawful to discharge an employee for actions that are protected from discrimination under the [MWPA]. . . . [T]he term 'protected action' derives from the MHRA, but the requirements that must be met for an action to be afforded protection stem from the [MWPA]."  *Costain*, 2008 ME 142, ¶ 6 n.2, 954 A.2d at 1053 n.2.

*** 

**D.**  The employee acting in good faith has refused to carry out a directive to engage in activity . . . that would expose the employee or any individual to a condition that would result in serious injury or death, after having sought and been unable to obtain a correction of the . . . dangerous condition from the employer[.]

*Id.* § 833(1)(B) & (D).

For purposes of subsection (B), "good faith" is a subjective belief at the time of the report that a specified condition poses a risk to the health or safety of another.  *See, e.g., Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 154-55 (Me. 1991).  The belief must have been "reasonable," meaning objectively reasonable.  *See, e.g., Tripp v. Cole*, 425 F.3d 5, 9 (1st Cir. 2005).

The protection afforded by subsection (D) "is limited to situations involving a physically dangerous condition."  *Devoid v. Clair Buick Cadillac, Inc.*, 669 A.2d 749, 751 (Me. 1996).  It pertains to an employee who "has been ordered to do something he reasonably believes will subject him or others to serious injury or death."  *Smith v. Heritage Salmon, Inc.*, 180 F. Supp.2d 208, 217 (D. Me. 2002).

The defendants seek summary judgment as to Count I on grounds that Brown fails to generate a triable issue as to any of the three requisite elements: protected activity, adverse action, or causal link.  *See* S/J Motion at 3-14.

### 1.  Protected Activity

As to the first element of Brown's cause of action, the defendants argue that Brown fails to generate a triable issue, for purposes of subsection (B), that his report of health and safety concerns regarding A.G.'s performance of fire police duties was either made in good faith or was reasonable, and, for purposes of subsection (D), that the Town issued him a "directive" or that following the Town's advice would have exposed any individual to a condition that would result

in serious injury or death.  *See id*. at 3-8.

### a. Report of Risk

The defendants observe that, although there is no dispute that retaining A.G. as a *firefighter* posed a health or safety risk, Brown's retaliation claim stems from his report that transferring A.G. to the *fire police officer* job would do so.  *See id*. at 3-4.  The Town contends that this report was neither made in good faith nor reasonable because it was based on a comparison of the 2003 Evaluation with a written job description and:

1.      The 2003 Evaluation, at the time of the reported concern, was two and a half years old and hence outdated, and it addressed A.G.'s fitness for duty as a firefighter, not a fire police officer.  *See id*. at 4.

2.      The written job description did not reflect the job duties actually performed by fire police officers, and A.G. could have performed the actual duties to the same extent as the incumbent fire police officers.  *See id*.

3.      The safety concerns that Brown cites were associated with the firefighting, not the fire police officer, position.  *See id*.  Brown's report of safety concerns regarding the fire police position made no sense to the selectmen because Brown did not object to A.G.'s remaining a firefighter.  *See id*. at 5.

4.      If Brown intended to make a good-faith, reasonable evaluation of A.G.'s ability to perform fire police duties, he would have subjected him to the same scrutiny as other fire police officers, whom he did not require to undergo a fitness for duty evaluation.  *See id*.  Alternatively, he could have sent A.G. to Health Connections in 2005 for a current evaluation based on the fire police officer, rather than the firefighting, job.  *See id*.

5.      Other evidence suggests a lack of good faith or reasonableness, including

Brown's disapproval of the MHRC consent agreement allowing A.G. to remain in the Fire Department with accommodations, Brown's statement to selectmen that he wanted to keep A.G. in the firefighting position because it would be easier to remove him from the department, and Brown's feeling that A.G. should be removed because of his assertion of his rights under the MHRA, which, among other things, created a "disturbance" in the department. *See id.*

The breadth of the defendants' attack notwithstanding, the cognizable evidence, viewed in the light most favorable to Brown, suffices to raise a triable issue whether Brown made a good-faith, reasonable report that A.G.'s restrictions would have put at risk A.G.'s, or others', health or safety, if A.G. were moved to the fire police officer job. Specifically, Brown adduces evidence that:

1.  In assessing A.G.'s fitness to perform the fire police officer job, he did not rely on the 2003 Evaluation but rather on A.G.'s own physician's earlier evaluation stating that, after having reached maximum medical improvement, A.G. was restricted from prolonged standing. *See* Plaintiff's Additional SMF ¶ 9; Defendants' Reply SMF ¶ 9; Plaintiff's Additional SMF ¶¶ 24, 26; Brown Decl. ¶¶ 15, 19.

2.  Neither A.G. nor any of his physicians submitted further documentation suggesting that the standing restriction had been lifted. *See* Plaintiff's Additional SMF ¶ 10; Defendants' Reply SMF ¶ 10.

3.  In addition, the 2003 Evaluation stated that A.G. was precluded from lifting more than 20 pounds. *See id.* ¶ 13. This list of restrictions remained the same for the rest of the time that Brown was fire chief. *See* Plaintiff's Additional SMF ¶ 14; Brown Dep. at 238.

4.  A fire chief must defer to a physician's medical expertise in assessing employees' physical restrictions. *See* Plaintiff's Additional SMF ¶¶ 27-28; Defendants' Reply

SMF ¶¶ 27-28.

5.     Ensuring the safety of operations of the Fire Department was a primary responsibility of the fire chief and should be one of the fire chief's top concerns. *See id.* ¶ 23.

6.     A fire police officer directs traffic and performs other critical safety functions at the scene of a fire and takes care of equipment following a fire, including removing heavy fire hoses. *See id.* ¶ 41.  In order to meet the requirements of the Town's written job description in effect at the time for the fire police officer position, an individual had to be able to stand continuously for extended periods of time, directing traffic and performing crowd control functions, and clean up fire scenes, including moving debris and fire hoses, which weigh 40 pounds or more. *See id.* ¶ 19.

7.     In order to perform the position of fire police officer, as reflected in the written job description, without endangering other Fire Department employees or the public, an employee would, at a minimum, have to be able to move fire hoses, which weigh considerably more than 20 pounds, and stand continuously for extended periods of time directing traffic and performing crowd control functions. *See id.* ¶ 25.

8.     The two individuals who were actually performing the fire police officer job were able to perform all of the essential functions of the fire police job as set forth in the written job description. *See id.* ¶ 20.

9.     The Fire Department's police officers in fact did have to stand for extended periods of time of at least an hour to be able to do the job.  *See* Plaintiff's Additional SMF ¶ 47; Grierson Decl. ¶ 7.  In certain situations, such as a car accident resulting in a death, a fire police officer sometimes had to stand and direct traffic for as many as five consecutive hours.  *See* Plaintiff's Additional SMF ¶ 48; Grierson Decl. ¶ 7.  At times, both incumbent fire police

officers stood continuously for an hour or longer in order to perform their duties.  *See* Plaintiff's Additional SMF ¶ 49; Defendants' Reply SMF ¶ 49.

10.     Brown was concerned, and expressed concern to Grierson at the time, that a serious injury would likely occur if A.G. were placed in the fire police officer position.  *See* Plaintiff's Additional SMF ¶ 43; Grierson Decl. ¶ 6.  Although keeping A.G. on as a firefighter posed a continuing risk, Brown had not been consulted regarding the decision to do so, and he viewed moving A.G. to the fire police position as creating a comparable safety risk.  *See* Plaintiff's Additional SMF ¶¶ 16-17; Defendants' Reply SMF ¶¶ 16-17; Defendants' SMF ¶¶ 22-23; Plaintiff's Opposing SMF ¶¶ 22-23.

11.     A.G.'s inability to stand for prolonged periods exposed A.G., other Fire Department members, and the public to a risk of serious injury because, as a result, traffic might not be controlled at a fire scene, a firefighter or firefighters might have to be called away from firefighting duties to control traffic, or A.G. might exceed his medical limitations and injure himself.  *See* Plaintiff's Additional SMF ¶ 45; Brown Decl. ¶ 25.

12.     Brown offered A.G. another position within the police department that A.G. could safely perform within his medical limitations, the newly-created administrative assistant position, but A.G. refused it.  *See* Plaintiff's Additional SMF ¶ 32; Defendants' Reply SMF ¶ 32.

13.     Had A.G.'s medical restrictions been removed, Brown would have kept him on as a firefighter.  *See id.* ¶ 34.

Were a trier of fact to credit this evidence over the defendants' conflicting evidence, he or she reasonably could conclude that Brown's report was made in good faith, that is, founded on a genuine belief that transfer to the fire police officer job posed a safety or health risk to A.G. or others, rather than motivated by animus against A.G. or a desire to retaliate against him for his

filing of an MHRC claim.  A trier of fact could also reasonably conclude that Brown's belief was objectively reasonable in view of A.G.'s stated medical restrictions, the essential functions of the fire police officer job as reflected in the operative written job description and in the actual performance of the job, and the health and safety risks to A.G. and others of placing someone in the job who had A.G.'s standing and lifting restrictions.[48]

### b. Directive to Brown

The defendants argue that Brown fails to generate a triable issue that his actions constituted protected activity under subsection (D) because he adduces no evidence from which a reasonable trier of fact could conclude that he was issued a "directive" to transfer A.G. to the fire police position or that serious injury or death would have resulted if A.G. were transferred.  *See* S/J Motion at 6-8.

The cognizable evidence, viewed in the light most favorable to Brown, suffices to permit a conclusion that he was issued a "directive" to transfer A.G.  This is so because:

1.      The defendants themselves maintain that, while the fire chief should have some control over his personnel, employment decisions that involve risk of liability, going to court, or the Town being sued are the responsibility of the board rather than of a department head.  *See* Defendants' SMF ¶ 50; Northgraves Dep. at 42, 44.

2.      While the board initially endeavored to persuade Brown to transfer A.G., even going so far as to enlist the aid of a neutral attorney, McGill, it made clear after those efforts failed that Brown's failure to comply with its request placed his job in jeopardy.  *See*

---

[48] The defendants point out, *inter alia*, that three months after A.G.'s doctor submitted his note setting forth A.G.'s restrictions, Health Connections imposed no standing restriction.  *See, e.g.*, Defendants' Reply SMF ¶ 9; Brown Dep. at 231-32; Brown Dep. Exh. 20.  Nonetheless, because (i) A.G.'s doctor had offered an opinion as to A.G.'s restrictions upon attaining maximum medical improvement, and (ii) the Health Connections evaluation was completed only three months later, Brown reasonably could have resolved the seeming conflict by crediting A.G.'s doctor's conclusion.

Defendants' SMF ¶¶ 44-45, 52-53; Plaintiff's Opposing SMF ¶¶ 44-45, 52-53; Plaintiff's Additional SMF ¶ 62; Defendants' Reply SMF ¶ 62.

      3.     Although the board did reappoint Brown despite his ongoing refusal to transfer A.G. to a police officer job, a reasonable trier of fact could conclude that this did not undermine the status of the "request" to transfer Brown as a "directive."  The Town's citizens, with the strong backing of the selectmen, had by then approved amendments to the Fire Department ordinance that Brown and Grierson characterize as removing the power of the fire chief to employ and terminate Fire Department employees.  *See* Plaintiff's Additional SMF ¶ 73; Brown Decl. ¶ 37; Plaintiff's Additional SMF ¶ 80; Grierson Decl. ¶ 11.  These amendments, according to Brown's evidence, left him with only two options for opposing the directive to transfer A.G.: to resign or "take it to court."  *See* Plaintiff's Additional SMF ¶ 81; Northgraves Dep. at 51-53. One reasonably could infer that the selectmen no longer needed to oust Brown to accomplish the end of transferring A.G. to a fire police position.

      Brown also adduces sufficient evidence to present a triable issue as to whether he reasonably believed that the transfer of A.G. would expose any individual to a condition that would result in serious injury or death.  Crediting Brown's evidence, A.G. was incapable of doing the prolonged standing and the heavy lifting delineated in the relevant job description and actually necessitated from time to time on the job.  Per Brown's evidence, A.G.'s inability to stand for prolonged periods exposed A.G., other Fire Department members, and the public to a risk of serious injury because, as a result, traffic might not be controlled at a fire scene, a firefighter or firefighters might have to be called away from firefighting duties to control traffic, or A.G. might exceed his medical limitations and injure himself.

## 2.  Adverse Action

The defendants next argue that Brown fails to raise a triable issue that he was subjected to adverse employment action as a result of protected activity.  *See* S/J Motion at 8-12.

The Law Court has held that "threats by an employer against the employee's status of employment may constitute discriminatory acts under the MWPA, without regard to whether or not the threats were actually acted upon." *LePage v. Bath Iron Works Corp*., 2006 ME 130, ¶ 21, 909 A.2d 629, 636.  "The plain language of the statute includes threats, but only those regarding the employee's compensation, terms, conditions, location or privileges of employment."  *Id*. at ¶ 22, 909 A.2d at 636 (citation and internal quotation marks omitted).

The defendants admit that the selectmen's January 19, 2006, letter to Brown was a warning that, if he did not correct his behavior with regard to putting A.G. in the fire police officer position, his position was in jeopardy.  *See* Plaintiff's Additional SMF ¶ 103; Defendants' Reply SMF ¶ 103.  The selectmen expressly stated in that letter that Brown "should not assume that [he would] be reappointed" and that his failure to follow "highly qualified advice" given in regard to the A.G. situation "was inexcusable and borders on recklessness."  Defendants' SMF ¶ 76; Plaintiff's Opposing SMF ¶ 76.  Significantly, the letter closely followed a December 2005 meeting at which Brown felt threatened and at risk of loss of his job when Selectman Northgraves partially rose from his chair as he told him: "If you had done what we requested, we wouldn't be in this situation now."  *Id*. ¶ 105.

A trier of fact reasonably could conclude that the Town took adverse action against Brown, for purposes of the MWPA, by threatening not to reappoint him to the fire chief position.

38

### 3.  Causal Link

The defendants finally argue, with respect to Count I, that there is no evidence that the selectmen's conduct, including statements at the December 2005 meeting and in the January 2006 letter, was motivated by retaliatory animus as a result of Brown's asserted report or refusal to follow a Town directive.  *See* S/J Motion at 12-14.

The defendants contend that the undisputed evidence demonstrates that, at the 2005 meeting, the selectmen were upset not with Brown's report or refusal to obey a directive but at the fact that his handling of the A.G. matter led to the filing of an MHRC charge.  *See id*. at 13. The defendants assert that the January 2006 letter likewise was motivated not by retaliatory animus but by a desire to convey that the selectmen had lost confidence in Brown because he had failed to recognize that the Fire Department was a department of the Town and had failed to take direction from the Town and its attorneys.  *See id*.  They note that the selectmen subsequently met with Brown and his attorney, felt that the Town and Brown were "working toward a better place," and reappointed Brown to his position in April 2006.  *See id*. at 13-14.

Nonetheless, a reasonable trier of fact could conclude that the selectmen threatened Brown's employment precisely because he had balked at what, as noted above, reasonably could be construed as a directive to transfer A.G. to the job of fire police officer.  In addition, and relatedly, a trier of fact could find that the selectmen threatened Brown's employment at least in part because they strongly disagreed with his report that A.G. posed a safety risk in the fire police officer job.

That the selectmen later reappointed Brown does not undermine his bid to stave off summary judgment.  Viewing the evidence in the light most favorable to Brown, the selectmen

were able, prior to the reappointment decision, to accomplish their objective of being able to control A.G.'s placement by obtaining amendments to the Town's Fire Department ordinance, obviating the need to oust Brown.

For all of the foregoing reasons, summary judgment as to Count I should be denied.

## B.  First Amendment Claim (Count II)

In his second and final count, brought pursuant to 42 U.S.C. § 1983, Brown alleges that all four defendants retaliated not only against his handling of the A.G. request for transfer but also against his filing of the instant suit, in violation of his First Amendment rights to free speech and access to the courts, by making false and defamatory statements about his service as fire chief that were published in January 23, 2008, and February 15, 2008, editions of a local newspaper. *See* Amended Complaint ¶¶ 1A, 18A, 18B, 18C & 24.

"42 U.S.C. § 1983 does not endow plaintiffs with any substantive rights independent of those already granted under federal law." *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008). "To recover under § 1983, a plaintiff must prove that a deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States was carried out by persons acting under color of state law." *Id.* (citation and internal quotation marks omitted).  The defendants argue that Brown has failed to raise a triable issue that there was such a deprivation. *See* S/J Motion at 14-20; Defendants' Reply to Motion for Summary Judgment (Docket No. 36) at 5-6.

### 1.  Denial of Right of Access to Courts

The Supreme Court has recognized two categories of cases alleging denial of access to courts: (i) "claims that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time" and (ii) claims that "do not look forward to a class of future

litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." *Christopher v. Harbury*, 536 U.S. 403, 413-14 (2002) (footnotes omitted).

"While the circumstances . . . vary, the ultimate justification for recognizing each kind of claim is the same." *Id*. at 414. "Whether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Id*. at 414-15. "[O]ur cases rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id*. at 415. *See also, e.g., Rollins v. Magnusson*, 542 F. Supp.2d 114, 116 (D. Me. 2008) ("To succeed with [a 'backward-looking' claim for denial of access to the courts,] Rollins must be able to establish that his ability to litigate his appeal to the First Circuit was impeded to such an extent that it impacted the outcome of his appeal; that is he must make a showing of 'actual injury.'") (citations omitted).

Brown makes no showing that he "suffered injury by being shut out of court." *Harbury*, 536 U.S. at 415. He adduces no evidence that he has encountered difficulty pursuing litigation as a result of the selectmen's statements, and he fails to controvert their evidence that (i) he believes that his right of access to the court was affected by the two newspaper articles in question because "they were trying to imply that I should not be going to court[,]" Defendants' SMF ¶ 180; Brown Dep. at 50; (ii) he has now brought a claim in court based upon the making of those statements (the instant claim), *see* Defendants' SMF ¶ 182; Brown Dep. at 50-51, and (iii) he identifies no claim that he has been unable to bring as a result of those statements, *see* Defendants' SMF ¶ 183; Brown Dep. at 159. He accordingly generates no triable issue of

41

material fact as to whether the selectmen's allegedly defamatory statements transgressed his right of access to the courts.

## 2.  Chilling of Free Speech Rights

"The First Circuit has indicated that in a First Amendment retaliation claim [a] plaintiff must allege that his speech was in fact chilled or intimidated by the defendant's complained-of action." *Bloomquist v. Albee*, 421 F. Supp.2d 162, 180 (D. Me. 2006) (citation and internal quotation marks omitted).  "A mere allegation of harm is not enough[.]"  *Id*.  "Where a chilling effect is speculative, indirect or too remote, finding an abridgment of First Amendment rights is unfounded."  *Id.* (citation and internal quotation marks omitted).  *See also, e.g., Sullivan v. Carrick*, 888 F.2d 1, 4 (1st Cir. 1989) ("To show a First Amendment violation in this context Sullivan must allege that his speech was in fact chilled or intimidated by Carrick's letter.  He does neither in his complaint.  Absent such an allegation, no violation occurred.  In short, defendant's mere allegation that he was harmed does not amount to satisfying the causation requirement of a Section 1983 action.") (citations omitted).[49]

Brown contends that the selectmen's published statements were false and defamatory, *see, e.g.*, S/J Opposition at 4, and points to caselaw holding that retaliatory defamation can suffice to chill speech, *see, e.g., id.* at 14; *Tierney v. Vahle*, 304 F.3d 734, 740 (7th Cir. 2002) ("[D]efamation inflicts sufficient harm on its victim to count as retaliation . . . – that is, to be capable of deterring the exercise of free speech."); *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997) (denying qualified immunity when, *inter alia*, public official knew or should have

---

[49]  Brown contends that he need only show that the defamatory comments of which he complains would be sufficient to "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights[.]" Plaintiff's Objection to Defendants' Motion for Summary Judgment ("S/J Opposition") (Docket No. 26) at 8 (quoting *Zelnik v. Fashion Inst. of Tech*., 464 F.3d 217, 225 (2d Cir. 2006)).  Yet, the First Circuit and this court have focused not on the chilling effect of retaliatory conduct on the exercise of free speech rights by a person of "ordinary firmness," but rather on the effect on the plaintiff.  *See, e.g., Carrick*, 888 F.2d at 4; *Albee*, 421 F. Supp.2d at 181 n.64.

known that she may have been violating the plaintiff's First Amendment rights by falsely accusing him of stalking her in apparent retaliation for his critical comments).

Nonetheless, it is undisputed that Brown cannot think of anything that he would have expressed, any speech that he would have made, or any statement that he would have made, that he did not make because of the conduct of the Town or the individual defendants. *See* Defendants' SMF ¶ 184; Brown Dep. at 159-60. In this circuit, in the absence of such a showing, Brown fails to raise a triable issue that he suffered a redressable injury to his First Amendment free speech rights. *See, e.g., Carrick*, 888 F.2d at 4; *Albee*, 421 F. Supp.2d at 180.

The defendants accordingly are entitled to summary judgment as to Count II.

### IV.  Conclusion

For the foregoing reasons, I ***GRANT*** in part and ***DENY*** in part the Motion To Strike and recommend that the defendants' motion for summary judgment be ***GRANTED*** as to Count II and ***DENIED*** as to Count I.

### NOTICE

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 29th day of June, 2009.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge